UNITED STATES v. ERVIEN, Com'r of Public Lands of New Mexico.

(Circuit Court of Appeals, Eighth Circuit. October 29, 1917.)

No. 4673.

PUBLIC LANDS ⬤=65—GRANTS TO STATES FOR INTERNAL IMPROVEMENTS—APPLICATION OF PROCEEDS.

By Enabling Act June 20, 1910, c. 310, 36 Stat. 557, Congress granted and confirmed to the state of New Mexico, then being organized, large bodies of public land for 19 different purposes, to each of which was allotted separately and severally a specified quantity. Section 10 declares that all lands granted shall be held in trust to be disposed of in whole or in part only in the manner provided and for the several objects specified, and that the natural products and money proceeds of any of such lands shall be subject to the same trust as the lands producing the same. The act further provided means for the disposition of the land and investment of the proceeds and that the proceeds shall be deposited in funds corresponding to the grant under which the particular land producing such moneys was by the act conveyed or confirmed, and further that no moneys shall ever be taken from one fund for deposit in any other, or for any object other than that for which the land producing the same was granted or confirmed. Held, that the grant upon the conditions and limitations prescribed having been accepted by Const. N. M. art. 21, §§ 9, and 10, and some of the trusts being for such purposes as the establishment of insane asylums, etc., Act N. M. March 8, 1915 (Laws 1915 [2d Leg.] c. 60), authorizing the Commissioner of Public Lands to expend annually three cents on the dollar of the annual income from sales and leases of lands for making known the resources and advantages of the state, particularly to home seekers and investors, is in its application to the proceeds of such trust lands invalid, and compliance therewith by the Commissioner of Public Lands will be enjoined.

Appeal from the District Court of the United States for the District of New Mexico; Wm. H. Pope, Judge.

Suit by the United States of America against Robert P. Ervien, Commissioner of Public Lands of the State of New Mexico. From

a decree for defendant, complainant appeals. Reversed and remanded, with directions to enter decree for complainant.

Summers Burkhart, U. S. Atty., of Albuquerque, N. M.
Frank W. Clancy, Atty. Gen., for appellee.

Before HOOK, SMITH, and CARLAND, Circuit Judges.

HOOK, Circuit Judge. This is a suit by the United States to enjoin a threatened breach of trust by the Commissioner of Public Lands of the State of New Mexico in respect of the proceeds of lands granted and confirmed to the state on its admission to statehood. Upon submission of the cause on petition and answer, the trial court entered a decree for the defendant, and the government appealed. The material facts are undisputed.

By the Enabling Act of June 20, 1910 (36 Stat. 557), Congress granted and confirmed to the new state then being organized large bodies of public lands aggregating about 3,000,000 acres, for 19 different purposes, to each of which was allotted separately and severally a specified quantity. The lands were to be selected under the direction and subject to the approval of the Secretary of the Interior from the surveyed, unreserved, unappropriated, and nonmineral public lands of the United States within the limits of the state. Lands actually or prospectively valuable for the development of water power or for hydroelectric use or transmission were reserved. Section 10 of the act provides:

"That it is hereby declared that all lands hereby granted, including those which, having been heretofore granted to the said territory (of New Mexico), are hereby expressly transferred and confirmed to the said state, shall be by the said state held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same. Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any object other than that for which such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this act, shall be deemed a breach of trust."

The act also subjected the donations to the following limitations and restrictions: No mortgages or other incumbrances shall be given to any person or for any purpose under any circumstances. The lands shall not be sold or leased, in whole or in part, except to the highest and best bidder at public auction to be held at the county seat where the lands to be affected, or the major portion, lie. Notice of the auction of a prescribed character must be given in a manner and for a length of time specified. Minimum prices varying according to locations are prescribed. Separate funds are to be established for each of the several objects for which the grants and confirmations are made and, the act goes on—

"whenever any moneys shall be in any manner derived from any of said land the same shall be deposited by the state treasurer in the fund corresponding to the grant under which the particular land producing such moneys were by this act conveyed or confirmed. No moneys shall ever be taken from one fund for

deposit in any other, or for any object other than that for which the land producing the same was granted or confirmed."

The moneys are to be invested in safe interest-bearing securities to be approved by the Governor and the Secretary of State, who are to be bound for the faithful performance of their duties.

"Every sale, lease, conveyance, or contract of or concerning any of the lands hereby granted or confirmed, or the use thereof or the natural products thereof not made in substantial conformity with the provisions of this act shall be null and void, any provision of the Constitution or laws of the said state to the contrary notwithstanding."

The act further provides that:

"It shall be the duty of the Attorney General of the United States to prosecute in the name of the United States and its courts such proceedings at law or in equity as may from time to time be necessary and appropriate to enforce the provisions hereof relative to the application and disposition of the said lands and the products thereof and the funds derived therefrom."

Provision was also made for the acceptance of the act and the terms and conditions of the grant and confirmation, irrevocable without the consent of the United States and the people of the state.

The state accepted the grant and confirmation of the lands upon the conditions and limitations prescribed (sections 9 and 10, art. 21, Constitution of New Mexico). Afterwards, on March 8, 1915, the Legislature of the state passed an act (Laws 1915 [2d Leg.] c. 60) over the veto of the Governor entitled "An act concerning the publicity and promotion of public resources and welfare." It authorized the Commissioner of Public Lands to expend annually three cents on the dollar of the annual income from sales and leases of lands "for making known the resources and advantages of this state generally, and particularly to home seekers and investors." The defendant commissioner intends to exercise the authority so conferred and to devote a part of the avails of the lands granted and confirmed by Congress to the purposes mentioned.

We think it is clear that the contemplated use of the funds would be a breach of trust. Words more clearly designed than those of the act of Congress to create definite and specific trusts and to make them in all respects separate and independent of each other could hardly have been chosen. Each quantity of land with its proceeds was to be devoted to a particular object to the exclusion of all others. The act required "separate funds," and provided that:

"No moneys shall ever be taken from one fund for deposit in any other or for any object other than that for which the land producing the same was granted or confirmed."

If there had been a single donation in trust for one of the purposes specified, as, for example, "a miners' hospital for disabled miners," it could not reasonably be contended that the trust funds could properly be expended in advertising the agricultural resources of the state or to promote the general welfare. The aggregate of the lands granted and confirmed in trust comprised but about $1/20$ of the area of the state, all of which, together with the mass of other property privately

owned and subject to taxation, was interested in the exploitation of the resources of the state and the attraction of home seekers and investors. That there were a number of trust donations for separately defined purposes does not alter the situation. The idea of hotchpotch and a ratable contribution to a common object such as characterizes the proposed use was expressly negatived. While, of course, all of the trust purposes have relation to the general public good and would profit thereby, yet severally regarded, as was manifestly the intention, each is of a more definite and limited character. Congress did not intend that the lands granted and confirmed should collectively constitute a general resource or asset like ordinary public lands held broadly in trust for the people, or that the proceeds should constitute a fund like moneys raised by taxation for "general purposes." Nevertheless, the state legislative act in question proceeds upon such a theory. The limitations upon the powers over the expenditures of these trust funds are in some respects like those not infrequently found in state Constitutions that taxes shall not be levied except for expressed purposes to which alone they shall be devoted when collected. It would go without saying that taxes levied and collected "for the payment of the bonds and accrued interest thereon issued by Grant and Santa Fé counties, N. M." (one of the trust purposes here) could not under such restrictions be lawfully expended "for making known the resources and advantages of this state generally." The ordinary result of such publicity would be at the best a general good to the state, its inhabitants, their property and enterprises, in which the various trust purposes would not be interested in proportion to the value or amount of their respective estates. To some it would be difficult to trace more than an indirect advantage, an advantage too remote to justify the expenditure of trust funds guarded by such limitations as were here imposed and accepted. Some of the purposes designated in the act of Congress are: An asylum for the insane; an asylum for the deaf and dumb; a reform school; an institution for the blind; and the enlargement and maintenance of the territorial penitentiary. To each of these, as to the others, was given a specified quantity of land for its exclusive use and benefit with conditions in detail as to the method of sale and the keeping of separate funds and accounts without borrowing or lending between them. It is said that an advertisement of the entire state would benefit every portion of it, and that the attraction of home seekers and investors would make for a wider and better market for the trust lands. But Congress made definite provisions specifying the character and extent of the notices of the sales. If additional advertisements of the state at large and its resources are deemed advisable, the cost should come from available public funds, not from those of the trusts. The proposed campaign of publicity is for the general advancement of the state. It has no immediate or direct bearing upon the trust lands or purposes except as they are within and pertain to the state at large. For aught that appears, the lands may or may not be offered for sale at the time. The advantage accruing is too indirectly consequential to authorize the use of the trust funds. It would be but a step further to argue the advantage that would accrue to the trusts from the physical construction of some

of the attractive resources of the state that are to be advertised, such as systems of public highways, irrigation, public schools, and the like.

The decree is reversed, and the cause is remanded, with direction to enter a decree for the plaintiff.