250 P.2d 897

**STATE ex rel. SHEPARD v. MECHEM et al.**

No. 5593.

Supreme Court of New Mexico.

Dec. 12, 1952.

George Graham, C. C. McCulloh and W. R. Kegel, Santa Fe, for relator.

Joe L. Martinez, Atty. Gen., James B. Cooney and Frank B. Zinn, Asst. Attys. Gen., for respondents.

McGHEE, Justice.

This is an action in mandamus instituted on the relation of the Commissioner of Public Lands, who is charged by law with the care and administration of the public lands of New Mexico, to prevent alleged illegal diversions of trust funds produced by lands granted by the Congress of the United States for specific purposes, and to compel the restoration of such moneys to the proper funds.

Chapter 181, Laws of 1951, provided that not to exceed five per centum of the amount budgeted for the operation of offices and governmental departments operating on ear marked funds should be transferred into the general fund to help defray the general expenses of government. The Appropriation Act, Ch. 227, Laws of 1951, then appropriated $19,300, or five percent of the amount appropriated by it for the operating expenses of the state land commissioner to the general fund for the 40th and 41st fiscal years, respectively.

All of the money appropriated for the operation of the land office was derived from lands granted by the United States to the State of New Mexico by the Ferguson Act,

Act of June 21, 1898, 30 Stat. 484, and the Enabling Act, Act of June 20, 1910, 36 Stat. 557, for nineteen purposes, the majority of which were for the benefit of specific educational and penal institutions, and moneys derived therefrom were required to be kept in separate funds until invested in safe securities.

Acting upon orders of the state board of finance and the state auditor, the state treasurer transferred the amounts diverted, $19,300 for each of the fiscal years above stated, to the general fund, where they have been intermingled and become a part of the total sum in such fund. Regular expenses of government, chargeable from such general fund, have been paid therefrom.

The respondents question the right of the relator to prosecute this mandamus action, involving as it does the constitutionality of a statute, and also say the alternative writ did not allege any law or statute enjoining or requiring any action or duty by respondents which they have not taken or performed. They further say approximately three-fourths of the money has been spent and cannot be restored, and lastly assert such sums are proper to be charged against the various trusts as a contribution to the expenses of housing those administering the trust and for general governmental protection. In their brief they say only the Attorney General of the United States may maintain an action to enforce the terms of the trust.

The trust provisions and limitations applicable to the lands granted read in part as follows:

"That it is hereby declared that all lands hereby granted, including those which, having been heretofore granted to the said Territory, are hereby expressly transferred and confirmed to the said State, shall be by the said State held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same.

"Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any object other than that for which such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this Act, shall be deemed a breach of trust.

\* \* \* \* \* \*

"A separate fund shall be established for each of the several objects for which the said grants are hereby made or confirmed, and whenever any moneys shall be in any manner derived

from any of said land the same shall be deposited by the state treasurer in the fund corresponding to the grant under which the particular land producing such moneys were by this Act conveyed or confirmed. No moneys shall ever be taken from one fund for deposit in any other, or for any object other than that for which the land producing the same was granted or confirmed. The state treasurer shall keep all such moneys invested in safe interest-bearing securities, which securities shall be approved by the governor and secretary of state of said proposed State, and shall at all times be under a good and sufficient bond or bonds conditioned for the faithful performance of his duties in regard thereto as defined by this Act and the laws of the State not in conflict herewith." Sec. 10, Enabling Act, supra.

By sections 9 and 10 of Article 21 of our Constitution we accepted the grants of land with their trust provisions and limitations in the following language:

"This state and its' people consent to all and singular the provisions of the said act of congress, approved June twentieth, nineteen hundred and ten, concerning the lands by said act granted or confirmed to this state, the terms and conditions upon which said grants and confirmations were made and the means and manner of enforcing such terms and conditions, all in every respect and particular as in said act provided." Sec. 9, Art. 21, N.M.Const.

"This ordinance is irrevocable without the consent of the United States and the people of this state, and no change or abrogation of this ordinance, in whole or in part, shall be made by any constitutional amendment without the consent of congress." Sec. 10, Art. 21, N.M.Const.

█ The claim of insufficiency in the allegations of the alternative writ is clearly not well taken, in that the terms and conditions on which the lands were granted under the Enabling Act and our acceptance of them by the foregoing constitutional provisions are set out in the alternative writ. The point does not merit further mention.

Our jurisdiction in mandamus is granted by Article 6, Section 3 of our Constitution, which provides in part as follows:

"The Supreme Court shall have original jurisdiction in quo warranto and mandamus against all state officers, boards and commissions, and shall have a superintending control over all inferior courts; it shall also have power to issue writs of mandamus, error, prohibition, habeas corpus, certiorari, injunction and all other writs necessary or proper for the complete exercise of

its jurisdiction and to hear and deter-mine the same. * * *"

It is true there is some authority that the constitutionality of a legislative act will not be determined in an action of mandamus, but this is a minority rule. The majority rule is stated in 34 Am.Jur. (Mandamus) Sec. 82, as follows:

"The question of constitutionality is frequently interposed by a petitioner or relator in mandamus where he claims that a statute or ordinance which, if valid, would excuse the respondent from performing the duty or act in question is invalid. There seems to be no reason why the constitutionality of the act thus relied on may not be raised in such manner and most of the courts have taken this view. They have entertained questions thus interposed by the relator as to the constitutionality of statutes relating to such matters as the apportionment of the state into senatorial and assembly districts; municipal boundaries or territory; names of counties; fiduciary bonds; municipal debts, bonds, and taxation; construction of buildings; salaries of judges; terms of office; and other matters. * * *"

See also the annotation on this subject in 16 L.R.A.,N.S., 266, where the annotator states:

"* * * the right of a relator to question, by a mandamus proceeding, the constitutionality of a statute, is very generally recognized, subject, however, to the limitation that usually applies to mandamus proceedings, that mandamus is a discretionary writ and may be refused by the court in the exercise of its discretion. This limitation necessarily leads to some conflict among the decisions, which, however, is more seeming than real, and is generally based on the right of the court to exercise its discretion, rather than on a denial of the right to the relator to question by mandamus the constitutionality of a statute."

The annotator then reviews the decisions and in commenting on the three cases squarely deciding against the right to question the constitutionality of a statute in a mandamus proceedings, says, at p. 270:

"This doctrine appears to confuse the duty of the court with the duty of the officers or board made respondents to such a proceeding. If the act is unconstitutional, it is not a defense or justification to a public officer in the performance or non-performance of the duties of his office. While perhaps he ought not to be required to determine, at his peril, the constitutionality of a statute, and should obey the

terms of the same until its constitu-. tionality has been determined by a court of competent jurisdiction, and he undoubtedly has the right to obey and is justified in obeying the requirements of, or he may refuse to do an act in violation of, a statute not yet adjudicated unconstitutional, rather than determine the question himself, yet that is the question presented to the court by a mandamus proceeding to compel the doing or refraining from doing, by an officer or board, of some act violating a statute alleged to be unconstitutional. This is not requiring the board to pass upon the constitutionality of the statute, but is placing the burden, where it rightfully belongs, upon a court of competent jurisdiction."

In State v. Marron, 1913, 18 N.M. 426, 137 P. 845, 50 L.R.A.,N.S., 274, the state treasurer was mandamused to compel the investment of the permanent school funds in state highway debentures. The writ was denied because it was not broad enough, but we held that mandamus was the proper remedy to enforce the provisions of the trusts. One of the requirements of the grants was that proceeds of sales of the lands be invested by the treasurer in safe securities. It was stated, 18 N.M. at pages 441, 442, 137 P. at page 850:

"* * * The State Treasurer occupies as important a position, and is charged with even greater responsibility than they (the Governor, Secretary of State and Attorney General) are, in regard to the investment of these funds. His ministerial duty arises out of the law provided by Congress in the Enabling Act for the administration of this fund, and which act requires the fund to be kept invested in safe, interest-bearing securities. The duty is ever present, and is never discharged until the whole field has been explored and exhausted without avail. It is the law of the administration of the trust, not any order or direction of the Governor, Secretary of State and Attorney General, which furnishes the basis for any remedy against the State Treasurer by mandamus. If a given investment, under such circumstances, is safe, there is no discretion left in the State Treasurer under the terms of the rule for the administration of his trust prescribed by the Enabling Act. He must invest the funds in safe, interest-bearing securities, and he may be compelled to do so by mandamus."

■ This case not only settles the question of the availability of mandamus to enforce the provisions of the Enabling Act, but also gives a negative answer to the contention of the respondent that only the Attorney General of the United States may enforce its provisions.

It therefore follows the contentions of the respondents in the respects just dis-

·cussed are unfounded. We will now consider the case on its merits.

In United States v. Swope, 8 Cir., 1926, 16 F.2d 215 the Circuit Court of Appeals held ligitimate expenses in connection with administering and protecting the granted lands were properly chargeable against the receipts from such lands, basing its decision on the common law rule that a trust must bear its expense of administration absent a contrary provision in the instrument establishing the trust, and declaring that was the intention of Congress when it made the grants.

In 1929 the Legislature of New Mexico passed several acts appropriating money from the permanent reservoirs fund (one of the trust funds) to be used in investigating water resources in the state. The auditor refused to issue warrants in payment of expenses incurred in the investigations, and the state engineer brought an action in mandamus to compel their payment. In the case, State ex rel. Yeo v. Ulibarri, 1929, 34 N.M. 184, 279 P. 509, 511, this court held the expenses were properly chargeable to the trust, but said:

"*  *  * It will suffice to say here that the purpose expressed is 'for the establishment of permanent water reservoirs for irrigating purposes.' That the trust is binding and enforceable, and that the Legislature is without power to divert the fund for another purpose than that expressed, is not only

made manifest by the language of the Enabling Act, but has been decided by this court, by the United States Circuit Court of Appeals (Eighth Circuit), and by the Supreme Court of the United States. Lake Arthur Drainage Dist. v. Field, 27 N.M. 183, 199 P. 112; Bryant v. Board of Loan Commissioners, 28 N.M. 319, 211 P. 597; U. S. v. Ervien, 8 Cir., 246 F. 277; Ervien v. U. S., 251 U.S. 41, 40 S.Ct. 75, 64 L.Ed. 128."

In Lake Arthur Drainage Dist. v. Field, 1921, 27 N.M. 183, 199 P. 112, this court held the payment of drainage assessments against grant lands was not a proper charge against such trust fund, as drainage was not for the protection of the lands, but for their improvement.

By Chapter 60 of the Laws of 1915, the legislature passed an act over the veto of the governor entitled "An Act Concerning the Publicity and Promotion of Public Resources and Welfare" in which the commissioner of public lands was authorized to expend annually three cents on the dollar of the annual income from sales and leases of lands "for making known the resources and advantages of this State generally and particularly to homeseekers and investors". The commissioner proposed to spend the money and the United States brought suit to prevent the expenditures, claiming such would be a breach of the trust imposed upon the lands when they

were granted to the state. The United States District Court of New Mexico held the proposed expenditures were proper, but the Circuit Court of Appeals in United States v. Ervien, 8 Cir., 1917, 246 F. 277, 279, reversed the decision and remanded the case with instructions to enjoin such diversion of trust funds. In the course of the opinion it is stated:

"We think it is clear that the contemplated use of the funds would be a breach of trust. Words more clearly designed than those of the act of Congress to create definite and specific trusts and to make them in all respects separate and independent of each other could hardly have been chosen. Each quantity of land with its proceeds was to be devoted to a particular object to the exclusion of all others. The act required 'separate funds,' and provided that:

" 'No moneys shall ever be taken from one fund for deposit in any other or for any object other than that for which the land producing the same was granted or confirmed.'

"If there had been a single donation in trust for one of the purposes specified, as, for example, 'a miners' hospital for disabled miners,' it could not reasonably be contended that the trust funds could properly be expended in advertising the agricultural resources of the state or to promote the general welfare. * * * That there were a number of trust donations for separately defined purposes does not alter the situation. The idea of hotchpotch and a ratable contribution to a common object such as characterizes the proposed use was expressly negatived. * * *"

This language is particularly appropriate in the present case where the legislature has taken a pro rata part of some nineteen trust funds as a contribution to the general expenses of the state.

The Ervien case was carried to the Supreme Court of the United States and the opinion appears in 251 U.S. 41, 40 S.Ct. 75, 76, 64 L.Ed. 128, where the language of the circuit court was approved and the court added some of its own. We quote the following:

"The case is not in broad range and does not demand much discussion. There is in the Enabling Act a specific enumeration of the purposes for which the lands were granted and the enumeration is necessarily exclusive of any other purpose; and to make assurance doubly sure it was provided that the natural products and money proceeds of such lands should be subject to the same trusts as the lands inference it was declared that the dislicense of construction or liberties of producing the same. To preclude any position of any of the lands or of the

money or anything of value directly or indirectly derived therefrom for any object other than the enumerated ones should 'be deemed a breach of trust.'

"The dedication, we repeat, was special and exact, precluding any supplementary or aiding sense, in prophetic realization, it may be, that the state might be tempted to do that which it has done, lured from patient methods to speculative advertising in the hope of a speedy prosperity."

We cannot believe Congress intended when it made the grants that the proceeds of such trust lands should ever be used for general governmental purposes. The language of the grants and our acceptance is to the contrary.

We feel we should briefly discuss and cite the case of Bryant v. Board of Loan Com'rs of New Mexico, 1922, 28 N.M. 319, 211 P. 597. Congress had made a grant of land for the purpose of paying debts arising from the issuance of railroad bonds by Santa Fe and Grant counties and the Town of Silver City. There was no mention in the grant of reimbursing the counties and town for interest they had theretofore paid. Congress subsequently passed an act consenting to such reimbursement, and the legislature passed an act authorizing the issuance of bonds to make reimbursement of interest previously paid, as well as payment of the debt outstanding.

This court held that although Congress had given its consent to the reimbursement, and the legislature had authorized it, a constitutional amendment would have to be adopted before the funds could be so used. The Bryant case clearly shows the expenditure of the trust funds in question is controlled not only by the act of Congress granting them, but by the terms of sections 9 and 10, Article 21 of the New Mexico Constitution.

If the Congress had intended that any part of the proceeds from the lands so granted could be used for general governmental purposes, it would not have used such restrictive language in the acts granting the lands, and required the state to agree to such conditions by constitutional provisions irrevocable without congressional consent.

For the reasons stated, we are of the opinion the acts of the 1951 Legislature attempting a diversion of these trust funds to the general fund for general purposes were clearly unconstitutional and mere nullities.

It appears the trusts are contributing several hundred dollars each month, however, to the upkeep of the quarters they occupy in the capitol buildings, as shown by an exhibit in the case. As no complaint is made of such payment, its legality is not determined here.

The contention of the respondents that the moneys have been largely spent and

cannot be restored is without merit. It is agreed that at the close of the 40th fiscal year on June 30, 1952, there was a balance in the general fund of more than one million dollars, and on November 1, 1952, there was considerably more in the fund. The balance was increased by the amounts diverted from the trust fund, and it will be an easy matter for the treasurer to credit such amounts back to the various trust funds from which they were wrongfully taken.

This court did not permit a diversion of funds to defeat a lawful debt and a peremptory writ of mandamus in State ex rel. Stephens v. State Corporation Commission, 1918, 25 N.M. 32, 176 P. 866. There, on the service of the alternative writ where a salary was involved, the commission on the last day of the fiscal year exhausted its appropriation for such year by making a large purchase of postage stamps and then pleaded such fact in its attempt to defeat the issuance of a peremptory writ—inability to pay under the law. This court made short shrift of the plea and ordered the payment from the appropriation for the succeeding fiscal year. Similarly, in Idaho the auditor directed the treasurer to deposit a check received from the United States under an appropriation in aid of the Idaho Agricultural College in the general fund. This was done and the college brought mandamus to compel its transfer to the regents. In answer to a plea it had been commingled and payments made from the fund, the court said the deposit of the check in the general fund was illegal and the act of the treasurer in making his book entries in accordance with the direction of the auditor was a nullity. Melgard v. Eagleson, 1918, 31 Idaho 411, 172 P. 655.

In view of the funds available in the general fund, the money can be restored to the trust funds by book entries, and this the treasurer must do.

We know the state budget officers and members of the Legislature were fearful sufficient money would not be available to meet the appropriations made in 1951, but this fact does not afford legal justification for paying out these trust funds for general governmental purposes. A few of the appropriations payable from the general fund might be said to afford some incidental protection to the grant lands, but far too many have no relation whatever to such purpose. If the Legislature can divert the amount provided for by the 1951 acts, supra, what is to prevent it later diverting half or all of the receipts above the amount necessary for the administration of the trusts?

The alternative writ will be made absolute, and it is so ordered.

LUJAN, C. J., and SADLER, COMPTON and COORS, JJ., concur.