2001-NMCA-028

24 P.3d 803

**FOREST GUARDIANS, a nonprofit corporation; Southwest Environmental Center, a nonprofit corporation; Western Gamebird Alliance, a nonprofit corporation; Bridget Jacober, for herself, and on behalf of her minor children; Rich Atkinson, for himself, and on behalf of his minor children; Mary Lou Jones, for herself, and on behalf of her minor children; and Jeffrey Scott, for himself, and on behalf of his minor children, Plaintiffs–Appellants,**

v.

**Ray POWELL, in his official capacity as Commissioner of Public Lands; New Mexico State Land Office; and State of New Mexico, Defendants–Appellees,**

and

**New Mexico Cattle Growers Association, a nonprofit organization, on behalf of itself and its members; New Mexico Farm & Livestock Bureau, a nonprofit corporation, on behalf of itself and its members; and New Mexico Wool Growers, Inc., a nonprofit corporation, on behalf of itself and its members, Defendants/Intervenors–Appellees.**

No. 20,758.

Court of Appeals of New Mexico.

April 4, 2001.

Certiorari Denied, No. 26,915, May 22, 2001.

Steven C. Sugarman, Santa Fe, NM, James J. Tutchton, Earthlaw, Denver, CO, for Appellants.

Patricia A. Madrid, Attorney General, Katherine M. Moss, Ass't Attorney General, Santa Fe, NM, for Appellee State of New Mexico.

Kelly Brooks, Stephen G. Hughes, Special Ass't Attorneys General, New Mexico State Land Office, Santa Fe, NM, for Appellees Ray Powell and New Mexico State Land Office.

Lee E. Peters, Hubert & Hernandez, P.A., Las Cruces, NM, for Intervenors–Appellees.

*OPINION*

PICKARD, Judge.

{1} This case presents us with an opportunity to revisit the issue of who, other than the state and federal attorneys general, has standing to sue to enforce the land trust provisions of the Enabling Act, an issue last addressed in *Asplund v. Hannett,* 31 N.M. 641, 249 P. 1074 (1926). Plaintiffs are a coalition of environmental conservation groups and parents of children attending New Mexico public schools. Plaintiffs filed a complaint against the Commissioner of Public Lands, the New Mexico State Land Office, and the State alleging that certain Land Office rules, regulations, and practices violate the Enabling Act, Article XIII of the New Mexico Constitution, and the Land Office's fiduciary duty to the beneficiaries of the school lands trust. Defendants moved to dismiss the complaint on several grounds, including lack of standing to sue. The district court granted Defendants' motion, and Plaintiffs appealed. We hold that (1) the Enabling Act trust is a charitable trust and Plaintiff schoolchildren do not have a special interest in the trust sufficient to confer standing, (2) for the purposes of standing, there is an insufficient causal relationship between the Land Office's actions and the harm alleged to be suffered by the children, (3) Plaintiff conservation groups are not within the zone of interests to be protected by the Enabling Act or related constitutional provisions, and (4) the issues presented by this case do not rise to level of great public importance such that we would be justified in dispensing with the traditional requirements of standing. We affirm.

*Background*

{2} Plaintiffs Forest Guardians, Southwest Environmental Center, and Western Game-bird Alliance are environmental conservation groups whose primary interests are to restore and promote biological diversity on public lands. In addition, Forest Guardians and Southwest Environmental Center have bid on State school trust lands and have expressed an intention to continue bidding on lands that the groups consider ecologically significant. Plaintiffs Bridget Jacober, Rich Atkinson, Mary Lou Jones, and Jeffrey Scott are individual parents of New Mexico school-children.

{3} Plaintiffs filed a complaint in which they sought (1) an injunction prohibiting the leasing of school trust lands without adver-tisement and public auction, (2) a declaration that "all State laws, rules, regulations and practices" relating to six leasing procedures are invalid under the New Mexico Enabling Act and Article XIII of the New Mexico Constitution, and (3) a declaration that the Land Office "has violated their trust obli-gation by failing to protect the corpus of the trust by allowing state trust lands to deterio-rate." Defendants New Mexico Commission-er of Public Lands and New Mexico State Land Office moved to dismiss the complaint for lack of standing, lack of jurisdiction, fail-ure to state a claim, failure to exhaust man-datory administrative remedies, and res judi-cata. The Commissioner was joined, in a separate brief, by the New Mexico Attorney General. In addition, the New Mexico Cattle Growers Association (NMCGA) intervened over the objections of Plaintiffs and filed their answer to the complaint and their own motion to dismiss. The New Mexico Farm and Livestock Bureau, the New Mexico Pub-lic Lands Council, and the New Mexico Wool Growers, Inc. later intervened without objec-tion.

{4} In their response to Defendants' mo-tions to dismiss, Plaintiffs raised the doctrine of "great public importance" as an alternative source of standing and requested that the district court accept the case as a writ of mandamus. Defendants' reply objected to Plaintiffs' request on the grounds that Plain-tiffs had not followed the proper procedural rules for mandamus and argued that Plain-tiffs' claims did not raise questions of "public juris" such that the doctrine should be ap-plied. After hearing the parties' arguments, the district court ruled that Plaintiffs lacked standing to sue and granted Defendants' mo-tions to dismiss. This appeal followed.

*Discussion*

*Standard of Review*

{5} The determination of whether a party has standing to sue is a question of law, which we review de novo. *Douglas County v. Babbitt*, 48 F.3d 1495, 1499 (9th Cir.1995). In reviewing a motion to dismiss, we accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party. *See New Mexico Life Ins. Guar. Ass'n v. Quinn & Co.*, 111 N.M. 750, 753, 809 P.2d 1278, 1281 (1991).

*The Enabling Act*

{6} By the Act of June 20, 1910, 36 Stat. 557, ch. 310 (hereinafter the Enabling Act or the Act), Congress set forth the terms by which New Mexico would be admitted as a state. Under the Act, the federal govern-ment granted New Mexico certain lands within the State "for the support of common schools." Enabling Act § 6. By the terms of the grant, these lands were to be held by the State in trust. *Id.* § 10, ¶ 1. The Act set forth the conditions by which trust lands could be sold or leased and established limi-tations on the uses to which income derived from these lands could be put. The Act made it clear that actions taken in contraven-tion of any provision of the Act would consti-tute a breach of the trust. *Id.* ¶ 2.

{7} In *Asplund*, 31 N.M. at 665–66, 249 P. at 1083, our Supreme Court held that neither the Enabling Act nor the Constitution gives a taxpayer or citizen standing to sue to enforce the trust provisions of the Act. Plaintiffs argue that *Asplund* is not controlling based on the status and harms peculiar to the two classes of plaintiffs here. First, Plaintiffs assert that the schoolchildren's status as the beneficiaries of the Enabling Act trust is sufficient to confer standing to sue for the

Land Office's alleged breach of fiduciary duties. Second, recognizing that under trust law the conservation groups would lack standing, Plaintiffs remind us that the Enabling Act was incorporated into the New Mexico Constitution and assert standing based on the potential harm caused to them by the Land Office's ongoing rejection of the conservation groups' applications to lease trust lands. Third, Plaintiffs allege standing on behalf of the schoolchildren based on the allegations that the Land Office's practices result in less funding being available to the public schools, as well as the children's constitutional right to a free education. We will address each argument in turn.

*Trust Law*

■ {8} The Enabling Act, the New Mexico State Constitution, and case law make it clear that the lands granted under the Act as well as the profits to be derived from these lands are to be held in trust for the benefit of named institutions. *See* Enabling Act, § 10, ¶ 1; N.M. Const. art. XIII, § 1; N.M. Const. art. XXI, § 9; *Asplund*, 31 N.M. at 665–66, 249 P. at 1083. Although Plaintiffs and Defendants accept this basic proposition, the parties disagree about the nature of the trust and the concomitant issues of the identity of the beneficiaries and the standing of these alleged beneficiaries to enforce the trust. Plaintiffs argue that the law of private trusts controls our decision, and they advance New Mexico public schoolchildren as the true beneficiaries of the trust as opposed to the State itself or the "educational bureaucracy." The State Land Office, on the other hand, maintains that the Enabling Act trust is a charitable trust and that the beneficiaries are the citizens of the State. We agree with the Land Office.

■ {9} The primary differences between a charitable trust and other private trusts are that a charitable trust may be perpetual, the denominated recipients of the trust income may be indefinite, and the intended beneficiary is the community itself. *See* Restatement (Second) of Trusts § 364–65 (1959). The trusts created by the Enabling Act are perpetual. *See* NMSA 1978, § 19-1-17 (1917) (naming permanent and current

funds financed by trust lands); *State v. Llewellyn*, 23 N.M. 43, 64, 167 P. 414, 420–21 (1917). In addition, the recipients of the trust income, the "common schools," are indefinite. *See Bd. of Educ. v. Sch. Dist. No. 5*, 21 N.M. 624, 630, 157 P. 668, 670 (1916) (holding that school district was not named beneficiary of federal grant of lands for use and benefit of public schools, but was means of ascertaining otherwise indefinite beneficiaries). Finally, when the grants to support the common schools are read in the context of grants made to other Enabling Act land recipients, such as government buildings and a miners' hospital, we conclude that the intended beneficiary of the federal land grants is the general citizenry of the State, and that the purpose of the grants was to insure a source of funding to support the construction and maintenance of essential social institutions. *See* Enabling Act, § 7 (listing social institutions to be supported by federal land grants). Our conclusion that the Enabling Act trust is a charitable rather than private trust is further supported by our Supreme Court's analysis of a similar trust created by the federal government to benefit local school districts. *See Sch. Dist. No. 5*, 21 N.M. at 628, 157 P. at 669 ("The act of Congress ... created a charitable trust to be administered by the city of Albuquerque, as trustee[,] ... for the use and benefit of the public schools.... The real beneficiaries were, of course, the patrons of the schools and the taxpayers of the school district[.]").

■ {10} Having identified the Enabling Act trust as a charitable trust, we turn to the law of charitable trusts to determine who has standing to sue to enforce the trust. Traditionally, three categories of persons have such standing: (1) the state attorney general or other public officer, (2) a trustee as against co-trustees, and (3) persons having a special interest in the enforcement of the trust. *See* Restatement, *supra* § 391.

{11} The Enabling Act expanded the group of persons entitled to enforce the trust by reserving, in the grantor United States, the right to enforce the trust by making it the duty of the United States Attorney General to prosecute "in the name of the United States and its courts such proceedings" as

may be necessary. Enabling Act, § 10, ¶ 8. However, in establishing this duty, the Act provided that "[n]othing herein contained shall be taken as in limitation of the power of the state or of any citizen thereof to enforce the provisions of this act." *Id.* ¶ 9. Intervenors argue that, notwithstanding the actual language of the Act, this reservation was intended to restrict standing such that the United States Attorney General is the only person or agency that may sue to enforce the trust. We disagree. We understand the language regarding the Attorney General to simply and expressly trump the common law exclusion of the grantor from enforcement actions and to designate the agency within the federal government that is responsible for bringing suit. *See United States v. 41,-098.98 Acres of Land,* 548 F.2d 911, 914 (10th Cir.1977) (holding that United States is not authorized to collaterally attack State management of school trust lands by condemnation proceedings). As Intervenors concede in their brief, the State, as trustee, retains the power to regulate its own agencies and may also sue to enforce the trust. *See, e.g., State ex rel. Shepard v. Mechem,* 56 N.M. 762, 767–68, 250 P.2d 897, 900 (1952) (holding that Commissioner of Public Lands had authority to bring mandamus action to prevent illegal diversions of trust funds and rejecting contention that only United States Attorney General may enforce trust). With respect to private citizens, we are deciding only the narrow issue before us, namely whether public schoolchildren have a "special interest" in the enforcement of the trust such that standing would be justified.

{12} The limitation on standing to enforce a charitable trust "arises from the need to protect the trustee from vexatious litigation, possibly based on an inadequate investigation, by a large, changing, and uncertain class of the public to be benefitted." *Hardman v. Feinstein,* 195 Cal.App.3d 157, 240 Cal.Rptr. 483, 485 (1987). The fact that an individual may benefit from a charitable trust is insufficient to confer standing to bring an enforcement action. *See* Restatement, *supra* § 391 cmt. c; *see also Asplund,* 31 N.M. at 665–66, 249 P. at 1083 (holding that neither the Enabling Act nor the Constitution gives a taxpayer or citizen standing to

sue to enforce the trust provisions of the Act). Rather, individuals must show that they have a special and definite interest in the trust or are entitled to receive a benefit. For example, if a charitable trust was created to support the minister of a particular church, the minister would have standing to sue the trustees to enforce the trust. *See* Restatement, *supra* § 391 cmt. c. Likewise, if a trust were created to support a named institution such as a university, the university would have standing to enforce the trust. *See id.*

{13} Although the Enabling Act requires that trust income be used exclusively to support the common schools, the Act does not specify how or to which schools this income should be distributed. *See* Enabling Act, § 10, ¶ 2. Ultimately, the amount of funding received by the individual public schools is determined by the district in which the school is located and the Department of Education. *See* NMSA 1978, § 22–8–4 (1988) (stating that state department of education responsible for controlling preparation of all public school budgets); NMSA 1978, § 22–8–10 (1993) (requiring local school boards to determine estimated yearly budget for school district). Insofar as a particular public school is not entitled to receive income directly from the Enabling Act trust, Plaintiff schoolchildren are likewise not entitled. Therefore, we conclude that the schoolchildren lack the "special interest" necessary to sue to enforce the trust. *See* Restatement, *supra* § 391 cmt. c.

*The Constitution*

{14} As required by Section 2(I) of the Enabling Act, the State consented to be bound by all provisions of the Act in Article XXI, Section 9 of the New Mexico Constitution, and the Act became "fundamental law to the same extent as if it had been directly incorporated into the Constitution." *State ex rel. Interstate Stream Comm'n v. Reynolds,* 71 N.M. 389, 397, 378 P.2d 622, 627 (1963); *see also* N.M. Const. art. XII, § 12 (acceptance and use of Enabling Act educational grants). In addition, the State enacted Article XIII, which includes provisions regarding the administration and disposition of public

lands, including trust lands. Of particular relevance is Section 1, which provides that all public lands must be "held or disposed of as may be provided by law for the purposes for which they have been or may be granted." N.M. Const. art. XIII, § 1.

{15} Plaintiffs argue that even if they lack standing as beneficiaries of the Enabling Act trust, as citizens threatened with a unique injury, they nonetheless have standing to mount a facial challenge to Land Office practices that violate articles XIII and XXI. However, as our Supreme Court made clear in *Asplund*, "[t]he constitutionality of a statute is not in itself a cause of action, nor a head of equity jurisdiction." 31 N.M. at 650, 249 P. at 1077. To succeed in their quest for standing to mount a facial challenge, therefore, Plaintiffs must meet the traditional requirements for standing.

{16} "The requirements for standing derive from constitutional provisions, enacted statutes and rules, and prudential considerations." *John Does I Through III v. Roman Catholic Church of the Archdiocese, Inc.,* 1996–NMCA–094, ¶ 25, 122 N.M. 307, 924 P.2d 273. To acquire standing, a plaintiff must demonstrate the existence of " '(1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision.' " *Id.* ¶ 28 (quoting *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 551, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996)). In addition, the interest sought to be protected must be " 'arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " *De Vargas Sav. & Loan Ass'n v. Campbell,* 87 N.M. 469, 472, 535 P.2d 1320, 1323 (1975) (quoting *Data Processing Service v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). Finally, standing may be limited based on prudential consideration. *See John Does I Through III,* 1996–NMCA–094, ¶¶ 35–37, 122 N.M. 307, 924 P.2d 273,.

*Conservation Groups*

{17} Plaintiffs argue that the conservation groups differ from the plaintiff in *Asplund* because the groups suffer a particularized harm when their applications to lease trust lands are denied. However, the conservation groups are not alleging standing in relation to a specific, adverse action by the Land Office, which clearly they would have standing as lessees to appeal. *See* NMSA 1978, § 19–7–67 (1912); *see also Forest Guardians v. Wells,* 197 Ariz. 511, 4 P.3d 1054 (App.2000) (upholding decisions of Arizona State Land Office Commissioner to deny the appellants' grazing lease applications). In this case, Plaintiffs are precluded from appealing past denials of their lease applications because they have failed to follow the statutory procedure. *See* § 19–7–67 (requiring person aggrieved to file notice of appeal within sixty days of a contested decision). Instead, Plaintiffs assert that the alleged harm is ongoing given that the conservation groups intend to apply for leases of trust lands in the future and are therefore mounting a facial challenge to the Land Office rules and practices in question.

{18} In their reply brief, Plaintiffs argue that they need not suffer actual injury to bring a facial constitutional challenge because New Mexico cases have held that the threat of injury is enough. *See Am. Civil Liberties Union (ACLU) v. City of Albuquerque,* 1999–NMSC–044, ¶ 9, 128 N.M. 315, 992 P.2d 866; *Corn v. New Mexico Educators Fed. Credit Union,* 119 N.M. 199, 202, 889 P.2d 234, 237 (Ct.App.1994), *overruled on other grounds by Trujillo v. City of Albuquerque,* 1998–NMSC–031, ¶ 32, 125 N.M. 721, 965 P.2d 305. While we agree that the cases cited do support this assertion, we conclude that Plaintiffs have failed to show that the conservation groups are within the zone of interests to be protected by the constitutional provisions at issue in this case, an infirmity not shared by the plaintiffs in *ACLU* and *Corn.*

{19} Actual or threatened injury alone is not enough to maintain a particular cause of action. *See Key v. Chrysler Motors Corp.,* 121 N.M. 764, 774, 918 P.2d 350, 360 (1996); *John Does I Through III,* 1996–NMCA–094, ¶ 20, 122 N.M. 307, 924 P.2d 273 (discussing *Key*). To successfully assert standing, a plaintiff must also show that the

injury alleged is within the zone of interests to be protected by a constitutional provision or statute. *See Key,* 121 N.M. at 774, 918 P.2d at 360 ("We believe that the Act affords Key particular protection based on his existing and ongoing relationship with Chrysler. We do not construe Key's complaint as stating a cause of action based on the particular protection provided that relationship by the Act."). Plaintiffs concede that the provisions of the Enabling Act are not for the benefit of purchasers or lessees of trust land, but are solely for the benefit of the trust itself and for the institutions the trust was created to support. Therefore, although the conservation groups may have standing under different circumstances, such as for making an administrative appeal of a specific adverse decision, they lack standing to make a facial challenge because they are clearly not within the zone of interests to be protected by the Enabling Act or articles XIII and XXI of the Constitution.

{20} The cases cited by Plaintiffs are consistent with our holding. In *ACLU,* the Supreme Court held that the plaintiff parents and children had standing to challenge the constitutionality of a juvenile curfew ordinance despite the fact that none of the plaintiffs had been arrested under the ordinance. *See* 1999–NMSC–044, ¶ 9, 128 N.M. 315, 992 P.2d 866. The due process clause, however, is clearly designed to protect the rights of individuals against the government, and the ordinance at issue in *ACLU* implicated those very rights. *See id.* ¶ 23. Likewise, our decision in *Corn* recognized that the plaintiff's claim arose from her own rights under the equal protection clauses of the federal and state constitutions. *See* 119 N.M. at 202, 889 P.2d at 237. In both cases, the plaintiffs were asserting rights that were well within the zones of interests to be protected by the constitutional provisions at issue.

{21} The conservation groups also lack standing to bring a complaint on behalf of their members.

[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *see also New Mexico Right to Choose/NARAL v. Johnson,* 1999–NMSC–005, ¶¶ 13–14, 126 N.M. 788, 975 P.2d 841 (discussing requirements for standing to bring action on behalf of third parties). Plaintiffs do not allege that their members would have standing to sue in their own right. *See Asplund,* 31 N.M. at 650, 249 P. at 1076 (holding that individual citizens or taxpayers lack standing to sue to enforce an Enabling Act trust). In addition, the interests Plaintiffs seek to protect, namely the right of the school lands trust beneficiaries to the undivided loyalty of the Land Office and to the maximization of profits derived from the leasing of the trust lands, are not directly germane to the conservation groups' environmental purposes. *Cf. New Mexico Right to Choose/NARAL,* 1999–NMSC–005, ¶ 14, 126 N.M. 788, 975 P.2d 841 (holding non-profit organization had sufficient relationship to Medicaid-eligible women whose rights organization sought to assert).

{22} Our conclusion that the conservation groups lack standing is supported by prudential considerations. The purpose of limiting standing is to avoid burdening the courts with multiple lawsuits over the same issue. To accomplish this purpose, we will limit standing to those parties whose interests will compel them to pursue a claim with the adversarial zeal necessary to clarify the issues. *See John Does I Through III,* 1996–NMCA–094, ¶ 37, 122 N.M. 307, 924 P.2d 273. In this case, the interests of the conservation groups are not the same as the beneficiaries of the trust, and it is easy to imagine a situation in which the best action for the trust would be contrary to the conservation groups' self-avowed missions. Because the purpose of the Enabling Act is to maintain a permanent source of funding for crucial social institutions, it is necessary to limit standing to those individuals or organizations who will further that purpose. In addition, we share the Land Office's concern that holding

that the conservation groups, as past and future lessees of trust lands, have standing to mount a facial constitutional challenge in this case would render the requirements for exhaustion of administrative remedies meaningless.

*Schoolchildren*

{23} Unlike the conservation groups, the schoolchildren are arguably within the zone of interests to be protected by the Enabling Act and the school lands trust. Nevertheless, Plaintiffs must still show that the schoolchildren satisfy the three elements of standing: (1) injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. *John Does I Through III,* 1996–NMCA–094, ¶ 28, 122 N.M. 307, 924 P.2d 273. We conclude that Plaintiffs have failed to establish a sufficient causal relationship between the alleged injury and the Land Office's actions and have not demonstrated that a favorable decision in this case would result in increased funding to a particular public school or school district.

{24} Plaintiffs allege that the schoolchildren meet the "injury in fact" requirement because the Land Office's policies and practices "directly and imminently threaten the amount of funding provided to public education in New Mexico." Courts have defined the term "injury in fact" as "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical.' " *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted). The requirement that an injury be particularized means that Plaintiffs must suffer the injury in a personal and individual way. *See id.* at 560 n. 1, 112 S.Ct. 2130. Therefore, we understand Plaintiffs to allege that the schoolchildren suffer a harm when the schools which they attend receive less money as a result of the Land Office's challenged conduct. Plaintiffs remind us that a party may successfully assert standing even when the extent of an alleged injury is slight. *See New Mexico Right to Choose/NARAL,* 1999–NMSC–005, ¶ 12, 126

N.M. 788, 975 P.2d 841. We agree that the requirement of proving an injury in fact has been liberally construed by the courts, and we conclude that the Plaintiffs have satisfied this element of standing.

{25} However, Plaintiffs must also show a causal connection between the injury alleged and the conduct of which they complain. "[T]he injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' " *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130 (internal citations omitted). Similarly, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* at 561, 112 S.Ct. 2130 (quoting *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). We conclude that even if Plaintiffs' lawsuit was successful and the Land Office amended its rules and practices to increase income to the school lands trust, Plaintiffs have failed to establish that the result would be an actual increase in the funds available to individual public schools or school districts.

{26} The income generated by the leasing of school trust lands does not go directly to individual schools or districts, but is deposited in a series of funds before being disbursed pursuant to a complicated school budgeting process. First, the income is deposited in a "state lands maintenance fund," from which Land Office expenses are paid. *See* NMSA 1978, §§ 19–1–11 & 12 (1989). Once a month, any remaining balance attributable to the school trust lands is transferred from the maintenance to the "common school current fund." *See* NMSA 1978, § 19–1–20 (1996). Money from the "common school current fund" is then transferred to either the "public school utility conservation fund," NMSA 1978, § 6–23–7 (1997) or the "current school fund," NMSA 1978, § 22–8–32 (1976). The current school fund also includes money received from all fines and forfeitures collected under general laws as well as the proceeds of property coming to the state by escheat. *Id.* Once a month, any unencumbered balance in the current school fund is transferred to the "public school fund." *Id.* The public school

fund receives additional income from a variety of sources. *See, e.g.,* § 22–8–12.1(C)(2) (holding Department responsible for recommending legislative appropriations for public school fund). Finally, the public school fund is allocated to individual school districts through three distribution programs. NMSA 1978, § 22–8–14 (1988). Any money remaining in the public school fund at the end of a fiscal year reverts to a general fund. *Id.*

{27} The distribution of the public school fund among the various school districts is a complex process. *See, e.g.,* NMSA 1978, §§ 22–8–1 through 42 (1953, as amended through 2000) (Public School Finance Act). Each local school board is required to prepare and submit estimated yearly budgets, using a manual compiled by the Department of Education (the Department). *See* §§ 22–8–5, –6, –10, 12.1. These proposed budgets are then reviewed, amended and approved by the Department, *see* §§ 22–8–11, –12, –12.1, which ultimately decides how public school funds are allocated to the individual school districts, *see* § 22–8–15(A). Therefore, the funds available to a school district or individual school are dependent not only on the amount of revenue generated by the school trust lands and other State programs, but also on Department policies and procedures as well as decisions by the Department and local school boards. Given the complexity of this process, we conclude that there is not a sufficient causal relationship between the Land Office's actions and the amount of funding given to a particular school, much less the amount of funds devoted to a particular child's education. Furthermore, we are convinced that a judgment in Plaintiffs' favor could be rendered moot by the actions of local school board members and Department officials who are not a party to this lawsuit, but whose decisions and actions directly affect school funding. *See Lujan,* 504 U.S. at 560, 112 S.Ct. 2130.

{28} Plaintiffs cite to several out-of-state cases in support of their allegations that the schoolchildren suffer a redressable injury. *See Jeffries v. Hassell,* 197 Ariz. 151, 3 P.3d 1071 (App.1999); *Branson Sch. Dist. RE–82 v. Romer (Branson I ),* 958 F.Supp. 1501 (D.Colo.1997), *aff'd Branson Sch. Dist. RE–82 v. Romer (Branson II ),* 161 F.3d 619 (10th Cir.1998). In *Jeffries,* the plaintiff taxpayers with children attending Arizona public schools sued the Commissioner of the Arizona State Land Department, alleging that certain policies and practices regarding the leasing of school trust lands violated the Enabling Act, the Arizona Constitution, and the State's fiduciary obligations to the trust beneficiaries, "the public schools of Arizona." 3 P.3d at 1072. Although Plaintiffs concede that the *Jeffries* opinion does not discuss the issue of standing, they assert that "the failure to mention any problems ... supports the contention that schoolchildren and their parents ... have standing." We disagree. "Although the fact that the [plaintiff] was a party in the proceeding may represent an implicit determination that it had standing, we should not rely on a decision as authority with regard to matters not addressed in the opinion." *John Does I Through III,* 1996–NMCA–094, ¶ 21, 122 N.M. 307, 924 P.2d 273.

{29} In *Branson I,* the plaintiff school districts and public schoolchildren sued to enjoin the enforcement of an amendment to the Colorado Constitution that the plaintiffs alleged would violate the terms of the Colorado Enabling Act and would change the fiduciary duties of the State in managing school trust lands. *See* 958 F.Supp. at 1517–22. The defendants challenged the plaintiffs' standing to bring the action on several grounds, including that the plaintiffs' alleged injury was too speculative. *See id.* at 1506. The district court ruled that the potential for loss of revenue to the permanent school fund was a sufficient injury and rejected the state's argument that any loss of revenue caused by the Amendment would be made up for by legislative appropriations. *See id.* at 1509, 1511. In affirming the district court's ruling, the Tenth Circuit declined to address the finding that the loss of revenue was a sufficient injury, holding instead that the Amendment created a conflict in the loyalty of the school lands trustees, which was enough to confer standing. *See Branson II,* 161 F.3d at 630–31.

{30} We are not persuaded by the *Branson* line of cases for several reasons. First, the plaintiffs in *Branson* sought to invalidate a constitutional amendment that "injected a series of conflicting interests into the management of the school lands trust." *Branson II*, 161 F.3d at 631. The fact that the action at issue in *Branson* was a constitutional amendment approved by the people of Colorado raises questions of whether the attorney general or any other state official would act to enforce the school lands trust, given the potential conflict between the will of the voters and the interests of the public school beneficiaries. In addition, the federal government did not reserve the right to sue to enforce the Colorado Enabling Act trust, as it did in New Mexico. As such, had the *Branson* courts not afforded the plaintiffs standing to contest the amendment, it is unclear whether anyone else would have had standing or interest to do so. In the case at bar, however, we are not faced with this concern. The state and federal attorneys general clearly have the power, the duty, and the public's interest to enforce the New Mexico school lands trust should the Land Office or any other agency seek to violate the terms of the trust. Plaintiffs could have asked either attorney general to review this case and bring an action on their behalf or in the name of the government. Plaintiffs assert that their reason for not pursuing this alternative was the unlikelihood that a State official would sue another State agency. However, New Mexico case law is replete with examples of the Attorney General and other State officials bringing actions to compel government officials to perform necessary duties or to refrain from acting illegally. *See, e.g., State ex rel. Shepard v. Mechem*, 56 N.M. 762, 767–68, 250 P.2d 897, 900 (1952); *State ex rel. Clark v. Johnson*, 120 N.M. 562, 570, 904 P.2d 11, 19 (1995); *State ex rel. Udall v. Pub. Employees Ret. Bd.*, 120 N.M. 786, 787, 907 P.2d 190, 191 (1995).

{31} In addition, we note that a school district was a plaintiff in *Branson*. Although we are not clear that the law supports a holding that a school district satisfies the requirements for standing, we do note that by including the district as a plaintiff, the plaintiffs in *Branson* eliminated a third party whose independent actions might render the alleged injury incapable of redress by court action. *See Lujan*, 504 U.S. at 560, 112 S.Ct. 2130.

{32} Finally, given that New Mexico's public school budget process is complex, we are in fact persuaded by the argument rejected by the Court in *Branson I*: that the injury of lost revenue could be made up by legislative appropriations. *See* 958 F.Supp. at 1509. If there was any evidence that income from the school trust lands was paid directly to a school or district, we might conclude that there was a causal relationship between the Land Office's alleged mismanagement and the funding available to local schools. However, in reviewing Plaintiffs' complaint, we see no such evidence, and our canvas of the applicable law demonstrates the unlikelihood of such evidence existing. We conclude that the Plaintiff schoolchildren have failed to allege a causal connection sufficient to support standing.

{33} Finally, Plaintiffs' argument that the schoolchildren's constitutional right to a free education provides a legal basis for asserting standing was not raised below and therefore will not be considered on appeal. *See Spectron Dev. Lab. v. Am. Hollow Boring Co.*, 1997–NMCA–025, ¶¶ 30–32, 123 N.M. 170, 936 P.2d 852 (holding that normal rules of preservation apply to review of district court's ruling on a motion to dismiss). We note, however, that were we to reach this argument, we would likely agree with Defendants that Plaintiffs have failed to allege any facts in support of their assertion that the schoolchildren have been effectively denied their right to a free education.

*Great Public Importance*

{34} We agree with Plaintiffs that the doctrine of "great public importance" may be applicable to cases other than applications for writs of mandamus. It is unnecessary for us to reach this issue, however, because we conclude that the injuries alleged by Plaintiffs do not rise to the level of great public importance, as described by our Supreme Court. *See State ex rel. Coll v. John-*

*son,* 1999–NMSC–036, 128 N.M. 154, 990 P.2d 1277.

{35} Plaintiffs seek to compel the Commissioner to comply with his duties under the Enabling Act and the Constitution, alleging that the Commissioner's administration of grazing leases on the school trust lands results in less income for the public schools. In *Coll,* our Supreme Court made it clear that "the fact that a case involves a duty that state officials owe to the general public as a whole is not sufficient to show that the case involves an issue of great public importance." *Id.* ¶ 21. Instead, the doctrine is reserved for those cases involving "clear threats to the essential nature of state government guaranteed to New Mexico citizens under their Constitution." *Id.* Plaintiffs have not alleged that the Commissioner is infringing on the power properly belonging to another branch of government. *See, e.g., Johnson,* 120 N.M. at 573, 904 P.2d at 22 ("The Governor may not exercise power that as a matter of state constitutional law infringes on the power properly belonging to the legislature."). Without some indication that the challenged conduct threatens the integrity of state government or "the state's definition of itself as sovereign," we will not "allow Plaintiffs' invocation of the great public interest doctrine to blind us to traditional standards of justiciability." *Coll,* 1999–NMSC–036, ¶ 24, 128 N.M. 154, 990 P.2d 1277.

### Conclusion

{36} For the foregoing reasons, we affirm.

{37} **IT IS SO ORDERED.**

I CONCUR: A. JOSEPH ALARID, Judge.

MICHAEL D. BUSTAMANTE, Judge (concurring in part and dissenting in part).

BUSTAMANTE, Judge (concurring in part and dissenting in part).

{38} I fully concur in the majority's disposition of the conservation groups' claims, but I cannot agree with denying standing to the schoolchildren. The majority opinion applies our standing case law too cautiously and in the process essentially voids that provision of

Section 10 of the Enabling Act which reserves the "power . . . of any citizen [of the State] to enforce the provisions of this act." If schoolchildren—the real beneficiaries of the Act—cannot bring suit as citizens, no citizen can. I believe the majority has been led into error by its definition of the harm asserted by the schoolchildren. That error in turn leads to difficulties in its discussion of the remedy sought or available.

{39} The core of the majority's concern is that even if the Land Office increased income to the school land's trust, there is no way to establish that there "would be an actual increase in the funds" given to schools. Given the complex process of budgetary allocation and appropriation—which the majority accurately describes—I agree that no one can assert that a dollar of increased income will result in a dollar of increased money appropriated to any particular school or child. But this uncertainty is not fatal to standing because it focuses on the wrong part of the process.

{40} The schoolchildren's focus as stated in their complaint is on the amount of income generated by the trust lands; that is, on the amount of revenues provided to the complex process which results in specific appropriations. The final form of educational appropriation is a political process which the judiciary should not intrude upon. However, that process is of necessity affected by the total resources made available to it. To assert that increasing income from the trust lands is not a real remedy is an implicit assertion that the entity responsible for allocation of resources will not comply with the Enabling Act's requirement that all trust fund income be applied for the support of the schools in New Mexico. If we are to engage in assumptions, I choose to assume that increased income will be applied positively. Thus, increasing income at its source is a real remedy which can be provided through the exercise of conventional judicial process, depending, of course, on proof. Focusing on the source of income as the object of the litigation obviates all of the majority's concerns as to causation and remedy.

{41} The majority's focus on the political processes leading to appropriation in any

event proves too much. Given the complexities of the process and the impossibility of predicting or tracing income to allocation, an argument could be made that the State Attorney General and the United States Attorney do not have proper standing to make the same challenge the schoolchildren are attempting to bring here. After all, the uncertainty relied upon by the majority would infect their efforts to increase income also. I do not believe such a challenge would be successful were a claim to be brought by the Attorney General or the United States Attorney. Similarly, I do not believe it should deny these schoolchildren the ability to make their case.

{42} Finally, the majority expresses some comfort in the notion that there are other parties who can bring these claims. I do not understand why the theoretical availability of other persons who may have standing should defeat efforts by the schoolchildren to get the same issues heard. Despite their assumed ability to do so, no state or federal agency to date has raised the claims made by the schoolchildren here. I see no judicial economies or societal efficiencies to be gained by deferring to entities who to all appearances have no intention of acting in the foreseeable future. It is odd indeed to refuse standing here because the Attorney General—who is defending this case vigorously—has the power to make the claim these schoolchildren are already making. Fearing that the issues will never be heard, I respectfully dissent.