**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 22, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

PAUL BUTT, JR.,

        Plaintiff-Appellant,

v.

BANK OF AMERICA, N.A.,

        Defendant-Appellee.

No. 05-2175

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. CV-03-95 WPJ/FLG)**

Martin E. Threet, (Joey B. Wright, with him on the brief) Martin E. Threet & Associates, Albuquerque, New Mexico, for Plaintiff-Appellant.

Joseph W. Halpern (Bradford C. Berge and Trent A. Howell, Holland & Hart, LLP, Santa Fe, New Mexico, with him on the briefs), Holland & Hart LLP, Denver, Colorado, for Defendant-Appellee.

Before **HARTZ**, **O'BRIEN**, and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

     Plaintiff Paul Butt, Jr., contends that Defendant Bank of America, N.A., has breached its fiduciary duty to him as trustee of a trust created in 1948 to administer a New Mexico oil and gas lease. The district court dismissed Mr.

Butt's complaint, finding that the Bank never assumed trusteeship and therefore had no fiduciary duty. We find that the trust did not survive the death of its original trustee, and thus agree with the district court's conclusion that the Bank does not serve, and never has served, as trustee on Mr. Butt's behalf. We reverse, however, the district court's judgment that it need not conclusively find whether the Bank acted adversely to Mr. Butt's interest in specific transactions. As to those specific transactions, which we outline below, we remand for consideration of Mr. Butt's request for an accounting and imposition of a constructive trust.

## I. BACKGROUND

### A. A Brief History of Oil and Gas Lease No. A-4096

On April 21, 1931, the State of New Mexico issued Oil and Gas Lease No. A-4096 (the "Lease") to C. Frederick Luthy for the purposes of exploring for, developing, and producing oil and gas in lands located in Lea County. According to the parties, New Mexico law permitted legal title for the Lease to issue only in one person's name, but per a prior agreement, each of three men held a one-third interest in it: Mr. Luthy, Paul Butt, Sr., and E.T. Buckley. Over the years, those one-third interests were devised, inherited, and sold such that Paul Butt, Jr., ("Mr. Butt") now owns his father's third, three different parties own equal portions of Mr. Luthy's original third, and two different parties own equal portions of Mr. Buckley's original third. Because of New Mexico's single lease-holder policy, however, Bank of America, N.A.—the trustee of Mr. Luthy's testamentary

trust—holds actual title to the Lease, which apparently still bears Mr. Luthy's name.[1]   The dispute we encounter is between Mr. Butt and the Bank over the Bank's role as title holder of the Lease following Mr. Luthy's death.

On April 19, 1948, Mr. Luthy executed a "Declaration of Trust," which identified the Lease as the corpus and named him as trustee.  Under the terms of the document, Mr. Luthy was to have absolute control over the Lease and was to periodically disburse profits to the beneficiaries.  The document did not identify a successor trustee or establish any means for appointing one.[2]

---

[1] Bank of America, N.A. is the successor-in-interest to Albuquerque National Bank and a series of other banks that served as Mr. Luthy's executor and testamentary trustee over the years.  For ease of reference, we will generally refer to a lone entity, "the Bank."

Mr. Luthy's original one-third interest is now held in equal one-ninth shares by Mr. Luthy's three children—Cheryl Potenziani, the Cyrene Inman Trust, and Pennies from Heaven, L.L.C. (Fred Luthy, Jr.).  *See* App. Vol. I, at 141–42.

George Kaseman purchased Mr. Buckley's interest following the latter's death in 1936.  Mr. Kaseman met his demise soon thereafter in an explosion at a well on Lease property, and the interest passed to his estate and then to a testamentary trust in 1938, for which Albuquerque National Bank served as trustee.  In 1957, Defiance Coal Company, a shell corporation for a multitude of Kaseman heirs, purchased the interest.  Defiance sold its interest, in equal parts, to Branex Resources, Inc., and Oscura Resources, Inc., on December 1, 2000.  *See id.* at 141, 152; App. Vol. III, at 596, 601.

[2] In part, the Declaration of Trust stated:

> That Whereas, on the 21st day of April, 1931, the State of New Mexico granted to me an Oil and Gas Lease No. A-4096 . . . [and]
> Whereas, the consideration for said lease was furnished and paid by myself and Paul Butt, with E.T. Buckley being carried for a one-third interest for work

(continued...)

Paul Butt, Sr., passed on in 1953, whereupon Appellant Paul Butt, Jr., acquired his interest in the Lease. On December 7, 1954, Mr. Luthy, Mr. Butt, and the president of Defiance Coal signed an affidavit setting forth historical facts relating to the acquisition and management of the Lease. In the affidavit, the

[2](...continued)
> which he was to handle in connection with sale or development of the lease; and it was agreed between Paul Butt, E.T. Buckley and myself that I was to have complete control and final decision in all matters pertaining to the handling of said lease.
>
> Whereas, E.T. Buckley died before performing any services, and G.A. Kaseman later purchased the one-third interest of E.T. Buckley from the remarried widow of E.T. Buckley . . .; and
>
> Whereas, said lease was made to me, as trustee, for the equal benefit of the three (3) of us furnishing the consideration as aforesaid, subject to original agreement that, as title holder, I was to have complete control and final decision in all matters pertaining to the handling of said lease. . . .
>
> Now, Therefore, in consideration of the premises, I hereby acknowledge and declare that I stand seized of said several rights, titles and interests, in trust for said Paul Butt, his heirs and assigns, to the extent of one-third (1/3) thereof, for myself, my heirs and assigns, to the extent of one-third (1/3) thereof, and for Albuquerque National Trust and Savings Bank, Trustee under the Last Will and Testament of George A. Kaseman, Deceased, its successors and assigns, to the extent of one-third (1/3) thereof, and I hereby agree to convey the respective interests at the request and cost of said respective beneficiaries to such person or person and at such time or times as they shall respectively direct or appoint.

App. Vol. I, at 119–22.

-4-

parties identified the Luthy-Butt-Defiance entity as a "syndicate" and agreed that they had delegated "full and complete power of disposition" regarding the Lease to Mr. Luthy. App. Vol. I, at 124–29. The law firm that represented the entity at the time treated it as a joint venture and as a partnership for tax purposes.

Mr. Luthy died on January 11, 1963. His will named Albuquerque National Bank as executor of his estate and as trustee of his testamentary trust. One of the assets included in Mr. Luthy's estate was his one-third interest in the Lease. The Bank, in its capacity as Mr. Luthy's testamentary trustee, pays annual rents due under the Lease and generally obtains reimbursement from the other interest holders.[3]

The evidence presented to the district court revealed a series of transactions that the parties engaged in with respect to the Lease over the years. The district court's order identified these transactions by reference to tract numbers, which correspond to the "line" numbers on the original Lease. *See* Dist. Ct. Mem. Dec. 6; App. Vol. I, at 115–18.[4] For ease of reference, we adopt the same designations.

---

[3] At one time, the Bank also served as agent for Defiance Coal and thus may have paid annual rents and dues in that capacity as well. App. Vol. III at 242–44.

[4] The district court issued two opinions in this case, one pertaining to the Defendant's motion for summary judgment and one following trial. The former, which refer to as "Dist. Ct. Order," is found at App. Vol. I, at 51–65. The latter, which refer to as "Dist. Ct. Mem. Dec.," is found at App. Vol. I, at 84–102.

1. *The Humble Oil Assignment: Tracts 12, 13, 14, 18, 19, and 20*

On May 15, 1963, the Bank, Mr. Luthy's widow, Defiance Coal, and Mr. Butt sent a letter to Humble Oil & Refining Company offering to sell mineral interests in six tracts covered by the Lease. The offer letter stated that "the Estate of C. Frederick Luthy, now deceased, has the entire official title to said land but that the leasehold interest is actually owned one-third by Paul Butt Jr., one-third by Defiance Coal Company, and one-third by the Estate of C. Frederick Luthy, deceased." App. Vol. II, at 442. The letter also indicated that, in return for the assignment, the Luthy and Defiance interests would receive production payments while the Butt interest reserved an overriding royalty interest. Humble Oil accepted the offer on May 21, 1963.

On June 19, 1963, Humble Oil obtained a title opinion letter from the law firm of Hervey, Dow & Hinkle. The authoring attorney advised that "since Mr. Luthy is now deceased his power of control and sale has now ceased and it is not vested in his heirs or devisees." *Id.* at 449. Instead, the one-third interests were "titles in real property and not merely contract rights to profits." *Id.* In subsequent correspondence, the attorney further opined:

> I suppose that the trust which Mr. Luthy had in mind when he made his Affidavit of December 7, 1954 . . . and the unrecorded trust dated April 19, 1948 terminated when he died[, and that it] may be that upon the death of Mr. Luthy this became a dry trust and the legal title would go over to the beneficiaries under the Statutes of Uses . . . .

*Id.* at 479.

On October 8, 1963, Mr. Butt, by separate instrument, conveyed his interest in the six tracts to Humble Oil in exchange for $31,964.80.

2.  *The Rankin Farmout: Tract 3*

A few months prior to his death, Mr. Luthy executed a farmout agreement with Mann Rankin for a single tract covered by the Lease.  On November 9, 1962, Mr. Rankin's law firm sent him a letter questioning Mr. Luthy's "authority . . . as trustee or agent" for Mr. Butt and Defiance and advising Mr. Rankin to either have the latter two parties ratify the farmout agreement or acknowledge the power of Mr. Luthy to act on their behalf with respect to the Lease.  *Id.* at 351–52.  As noted above, Mr. Luthy perished in January 1963, in the midst of these dealings.  On October 31, 1964, Mr. Rankin executed an "Assignment of Overriding Royalty Interest," which acknowledged that he had been assigned the leasehold as to Tract 3 on October 22, 1964.  In consideration of that assignment, Mr. Rankin conveyed a ten percent overriding royalty interest and specified that the conveyance was a one-third interest to each of Mr. Butt, Defiance Coal, and the Bank as executor of Mr. Luthy's estate.

3.  *The Turner Farmout: Tracts 6 and 7*

In May 1962, Mr. Luthy offered to assign two tracts covered by the Lease to Charles R. Turner, with drilling to commence on or before June 15, 1962.  After Mr. Luthy's death, the Bank, Mrs. Luthy, Mr. Butt, and Defiance Coal

reaffirmed the offer—with a later drilling date—in a letter signed by each of them. Turner accepted the offer.

Two other transactions related to this farmout occurred over the next year, each with the individual written assent of the Bank, Mrs. Luthy, Mr. Butt, and Defiance Coal. In February 1963, the parties executed a letter amending the farmout per Mr. Turner's request. In July 1963, the parties executed a new offer to Mr. Turner, which he accepted.

Two years later, the parties engaged in further dealings with Mr. Turner. In September 1965, Mr. Turner wrote a letter to a trust officer at the Bank in which he reported that he had "discussed a trade with Mr. Paul Butt, on acreage owned by the Luthy Group." *Id*. at 387. On October 28, 1965, the Bank, in its capacity as executor and testamentary trustee of the Luthy estate, independently assigned the entire interest in Tracts 6 and 7 to Mr. Turner; in return, Mr. Turner assigned an overriding royalty to the Bank equal to 1/8 of all production. This transaction ignored the beneficial interest holders but, on May 25, 1970, they ratified it by signing a "Ratification and Amendment to Agreement" stating, in part:

> Whereas, prior to [the] Assignment to Turner, the Bank owned official legal record title to [the Lease], but the equitable or beneficial title to [the Lease] was actually owned an [sic] undivided 1/3 interest each by said Bank, Defiance, and Butt, and said Mapel (formerly Cyrene Luthy) as her community property owned ½ of the 1/3 beneficial interest of the Bank, and said Defiance, Butt and Mapel did not sign or ratify said Assignment by the Bank to Turner and they now desire to correct said matter . . . .

-8-

Now, therefore, . . . Defiance, Butt and Mapel hereby adopt, ratify and confirm said Assignment dated October 28, 1965 . . . and do hereby convey all of their title in said lease as to said land to Charles R. Turner . . . .

*Id.* at 395. In addition, the document assigned to each of the beneficial owners a 1/16 share of the overriding royalty interests in production occurring on the tracts.

4. *The Machris Assignment: Tract 1*

On October 6, 1954, Fred and Cyrene Luthy assigned to M.A. Machris the interest in Tract 1 of the Lease; in return, Machris and his wife assigned to Mr. Luthy a 15% overriding royalty interest in production on the tract. On May 24, 1963, Cities Service Oil Company—a buyer from Machris of gas produced from Tract 1—prepared a "Division Order" for signature by the Bank indicating that the Bank was the owner of a 15% overriding royalty interest in Tract 1.[5] The record copy of the order does not contain a signature for the Bank. Similarly, on May 27, 1963, Warren Petroleum Corporation—another Machris buyer—prepared a "Division Order" for signature by the Bank indicating that the Bank was the owner of a 15% overriding royalty interest in the tract. Again, the record copy of the order does not contain a signature for the Bank.

5. *The Pauley Petroleum Assignment: Tract 10*

---

[5]A division order is an agreement that spells out the terms of the royalty payments by an oil company to the owner of an interest in a well.

In October 1965, the Bank, in its capacity as executor and testamentary trustee of Luthy's estate, assigned the entire interest in Tract 10 to Pauley Petroleum Company. In return, Pauley Petroleum assigned a 1/8 overriding royalty interest in production from the tract to the Bank as executor and testamentary trustee of the Luthy estate. Neither assignment mentioned the other beneficial interest holders in the Lease. The record does not contain any further evidence of activity with regard to Tract 10 until 1994, when Mr. Butt executed a term assignment of his interest in the tract to Logro Corporation, with a reservation of an overriding royalty interest.

6. *The Shell Oil Assignment: Tract 22*

On June 17, 1971, the Bank wrote a letter to Shell Oil Company regarding Tract 22 of the Lease. In the letter, the Bank explained that it had not executed a requested transfer order pertaining to the tract because the order assumed that the Luthy estate "owned a 1/21 interest of the 7/8 working interest of the State A Lea County, New Mexico lease." *Id.* at 506. The Bank explained that the "Luthy Estate in reality owned only a 1/3 interest in the 1/21 of the 7/8 working interest. Mr. Luthy was an equal partner in the Luthy-Butt-Defiance partnership. Thus, his interest was only 1/3 rather than the whole thereof." *Id.* In March of the following year, Shell executed a division order that reflected the separate interests of the beneficial interest holders in Tract 22. Each owner, including Mr. Butt, signed the order.

In May 1972, Mr. Butt communicated directly with Shell regarding his interest in Tract 22 and requested that the company send future checks and correspondence regarding the tract directly to him. Shell agreed, and the record demonstrates that the company sent IRS Form 1099 (reflecting royalty payments) directly to Mr. Butt for tax year 1972.

7. *Other Transactions by Mr. Butt*

Mr. Butt also approved a series of other transactions with regard to his interest in the Lease. On December 8, 1981, he assigned his interest in Tract 9 to HNG Oil Company. On January 3, 1992, Mr. Butt conveyed his interest in Tract 22 to the Permian Basin Acquisition Fund. On October 11, 1994, Mr. Butt assigned his interest in Tract 10 to Logro Corporation and granted an extension of that assignment on October 6, 1997. On January 10, 1998, Mr. Butt assigned his interest in Tract 2 to the Rio Pecos Corporation.

## B. The Lawsuit

In late 2002, Mr. Butt sued the Bank in New Mexico state court. His complaint took the form of a Petition for Accounting and Other Relief, and alleged that he was a beneficial owner of the Lease, which was held in trust by the Bank. Mr. Butt requested a full accounting of all royalty income and other profits paid to the Bank, and requested that the Bank remit to him any payments due, including interest.

After the Bank removed the case to federal court on diversity grounds, Mr. Butt filed an amended complaint in which he enunciated two distinct claims—breach of contract and breach of fiduciary duty. The Bank moved for summary judgment, contending that Mr. Butt's claims are time barred by the statute of limitations and the doctrine of laches. The Bank also argued that no fiduciary relationship existed between it and Mr. Butt and, even if there were such a relationship, no breach occurred. Lastly, the Bank argued that summary judgment was appropriate on the contract claim because no contract existed; even if one did exist, it was void; and if it were not void, no breach occurred.

On July 12, 2004, the district court granted in part and denied in part the Bank's motion for summary judgment. With respect to the statute of limitations argument, the Court held that the clock in New Mexico does not begin to tick until a claimant has discovered or should have discovered his right of action. The court found that, in this case, a genuine question of fact existed as to this issue. With respect to the laches argument, the court also found a disputed issue of material fact—again, whether and when Mr. Butt had notice of the conduct giving rise to the complaint. With respect to whether a trust relationship existed between the Bank and Mr. Butt, the court found that a genuine dispute existed as to whether the Bank undertook the role of trustee for the benefit of Mr. Butt and thus denied summary judgment on this ground as well. The court granted summary judgement, however, as to the contract claim. The court found that

-12-

because the basis of Mr. Butt's claim is an alleged oral promise made by Mr. Luthy to protect and manage Mr. Butt's interest in the Lease, the claim was barred by the New Mexico Statute of Frauds.

The district court ordered a bifurcated trial for the remaining fiduciary duty claim: a bench trial to determine whether a trust relationship existed, and, if necessary, a jury trial to determine whether a breach of duty occurred. Following the bench trial, the court issued a detailed order dismissing with prejudice Mr. Butt's remaining claim. In the order, the court set out, as factual findings, the history of the Lease recounted above. The court also found, with respect to the Humble Oil Assignment, that Mr. Butt exercised independent control over the assignment of his interests in Tracts 12, 13, 14, 18, 19, and 20. With respect to the Rankin Farmout, the court found that Mr. Butt was directly assigned 1/3 of the total overriding royalty interest. With respect to the Turner Farmout, the court found that Mr. Butt independently engaged in negotiations. With respect to the Turner Farmout, the Machris Assignment, and the Pauley Petroleum Assignment, the court found that the Bank may have acted adversely to Mr. Butt's interests, but that determinative findings were unnecessary given the court's ultimate disposition of the case. And with respect to the Shell Oil Assignment, the court found that Mr. Butt was recognized in 1972 as legal owner of 1/3 of the interest owned by the Luthy-Butt-Defiance venture and that royalty payments were made

directly to Mr. Butt, the taxes for which he has been directly responsible.[6]

Moreover, the court characterized Mr. Butt's assignments to the HNG Oil

Company, the Permian Basin Acquisition Fund, the Logro Corporation, and the

Rio Pecos Corporation as "independent transactions." The court also found no

evidence that the Bank was ever appointed to serve as trustee for the Lease or Mr.

Butt, noting that the 1948 Declaration of Trust did not name a successor trustee,

that the Bank was never designated to serve in any fiduciary capacity for Mr.

Butt, and that the Bank never affirmatively agreed to serve as trustee for Mr. Butt.

Turning to the legal questions in the case, the court applied the New

Mexico Uniform Trust Code ("UTC"), N.M. Stat. Ann. §§ 46A-1-101 through

46A-11-1104, a comprehensive statute enacted in 2003 and made retroactive by

its own terms. The court held that, under the UTC, the death of a trustee results

in a vacancy that must be filled, either by a successor designated in the trust, by a

replacement unanimously appointed by the trust beneficiaries, or by an appointee

---

[6] After reciting the facts of the Shell Oil Assignment, the district court order states, in full: "The Court finds, based on all of the evidence submitted with respect to Tracts 12, 13, 14, 18, 19, and 20, that Paul Butt, Jr. was recognized in 1972 as legal owner of 1/3 of the interest owned by the Luthy-Butt-Defiance venture. Royalty payments have been made directly to Paul Butt, Jr., and he has been responsible for the payment of taxes on these royalties." Dist. Ct. Mem. Dec. 14. The reference to "Tracts 12, 13, 14, 18, 19 and 20," is misplaced since those tracts were at issue in the Humble Assignment, not the Shell Assignment, which concerned Tract 22. We assume the district court meant to refer to Tract 22.

-14-

of the court. The district court assumed, without deciding, that Mr. Luthy, while alive, served as trustee for the Lease. The court further assumed that the trust did not fail upon his death and was thus absent a trustee upon that instance. Finding that the trust made no provision for a successor trustee and that neither the beneficiaries nor a court ever appointed a successor trustee,[7] the district court held that the Bank never served as trustee for the Lease and that "[n]o special relationship giving rise to a fiduciary duty existed at any time between [the Bank] and Paul Butt Jr." Dist. Ct. Mem. Dec. 17–18. The court thus dismissed Mr. Butt's action.

Mr. Butt timely appealed.

## II. DISCUSSION

It is important to distinguish between two different possible claims regarding a trust in this case. In accordance with state law requiring that legal title to an oil and gas lease issue only in one person's name,[8] the title to Lease No. A-4096 was issued in the name of Mr. C. Frederick Luthy. So far as appears from the record, the Lease still bears Mr. Luthy's name. App. Vol. I, at 142. To

---

[7] The court also held that while performing the duties of a trustee or accepting delivery of trust property can serve as acceptance of the role of trustee, this only occurs when the person or entity doing so has been designated as trustee. Because the latter status was never conferred upon the Bank, performance or acceptance of property could not serve to make the Bank trustee.

[8] Because the parties agreed that this was the law in New Mexico in 1931, the district court assumed this to be correct without deciding the issue. Dist. Ct. Order 2. We do the same.

maintain the Lease, annual taxes and rentals must be paid to the State. It is undisputed that the Bank has performed these functions over the years.

In addition, as a result of an express "original agreement" among the three owners of the Lease, Mr. Luthy was given "complete control and final decision in all matters pertaining to the handling of said lease." *Id.* at 119. This agreement was formally memorialized in a Declaration of Trust executed in 1948.

We do not understand the parties to be arguing, and in any event would not conclude, that record title holder of an oil and gas lease under New Mexico law is a trustee for the actual owners in the sense relevant to this case. If it were not for the "original agreement" and the later Declaration of Trust, Mr. Luthy would not have had unilateral authority to engage in financial transactions and sign deals with regard to the Lease, and would have had no concomitant fiduciary duties to the other interest holders. The real question in this case pertains to the express trust, and specifically whether the Bank is a successor trustee to Mr. Luthy. The district court held that it is not.

Mr. Butt argues that the district court applied the wrong law in this case and, consequently, erred in determining that the Bank does not serve as trustee of the Lease property for his benefit. He maintains that under the properly applicable law—New Mexico trust law as it existed either at the time of the formation of the trust or at the time of Mr. Luthy's death—the Bank automatically acceded to trusteeship upon Mr. Luthy's death. In the alternative, Mr. Butt argues

that the Bank acted against his interest in the Lease and therefore holds profits from those actions in a constructive trust.[9]

**A. Is the Bank a Trustee Under New Mexico Law?**

1. *Application of the Uniform Trust Code*

When exercising diversity jurisdiction, we apply state law with the objective of obtaining the result that would be reached in state court. *Perlmutter v. U.S. Gypsum Co.*, 4 F.3d 864, 869 (10th Cir. 1993). The district court correctly turned its attention to New Mexico's Uniform Trust Code, N.M. Stat. Ann. §§ 46A-1-101 through 46A-11-1104, which went into effect during the pendency of this action. 2003 N.M. Laws, ch. 122, § 1-101. The UTC "applies to all trusts created before, on or after its effective date," N.M. Stat. Ann. § 46A-11-1104(A)(1), and "to judicial proceedings concerning trusts commenced before its effective date, unless the court finds that application of a particular provision of the [UTC] would . . . prejudice the rights of the parties, in which case the particular provision of the [UTC] does not apply and the superseded law applies," *id.* § 46A-11-1104(A)(3). Except to the extent the UTC or other New Mexico

---

[9] In his jurisdictional statement, Mr. Butt asserts that he appeals the rulings on both his contract and breach of fiduciary duty claims. He presents legal argument, however, only as to the fiduciary duty claim. Accordingly, Mr. Butt has waived the breach of contract issue. *See Ambus v. Granite Bd. of Educ.*, 975 F.2d 1555, 1558 n.1 (10th Cir. 1992); *Abercrombie v. City of Catoosa, Okla.*, 896 F.2d 1228, 1231 (10th Cir. 1990).

statutes modify it, "[t]he common law of trusts and principles of equity supplement the [UTC]." *Id.* § 46A-1-106.

We assume, as did the district court, that the 1948 Declaration of Trust created a valid trust with Mr. Luthy as the trustee and Paul Butt, Sr., as one of the beneficiaries. When Mr. Butt the elder passed on, Mr. Butt the younger inherited his beneficial interest. If we were also to assume, as the did the district court, that the trust did not fail upon Mr. Luthy's death, then upon that instance "a vacancy in the trusteeship occur[red]." *Id.* 46A-7-704(A)(5) ("A vacancy in a trusteeship occurs if: . . . a trustee dies."). The UTC provides that "[a] vacancy in a trusteeship must be filled if the trust has no remaining trustee," *id.* 46A-7-704(B), "in the following order of priority: (1) by a person designated in the terms of the trust to act as successor trustee; (2) by a person appointed by unanimous agreement of the qualified beneficiaries; or (3) by a person appointed by the court," *id.* at 46A-7-704(C)(1)–(3). The district court found that none of these methods of appointment occurred at any time following Mr. Luthy's death and therefore held that the Bank never assumed trusteeship and had no fiduciary duty to Mr. Butt.

Carrying forward the assumption that the trust survived Mr. Luthy's death, nothing in the record conflicts with the district court's ultimate *factual* finding: at no time were any of the proper means of appointing a successor trustee under the UTC pursued by any party to this relationship. Mr. Butt is surely correct,

-18-

however, that if under New Mexico law in 1948 (when the trust was created) or 1963 (when Mr. Luthy died) the Bank would have automatically acceded to trusteeship, then the district court's *legal* conclusion was erroneous. The UTC, after all, explicitly states that where its application would prejudice the parties, superceded law applies. *Id.* § 46A-11-1104(A)(3). And if prior law would have rendered the Bank a fiduciary of Mr. Butt, then the UTC's nullification of that status would certainly be prejudicial to the trust beneficiaries. But Mr. Butt fails to direct to us to any law, extant at the time of the formation of the trust or Mr. Luthy's death, that supports his assertions. Instead, he reproduces a hodgepodge of provisions from New Mexico's 1953 code, none of which shed even the faintest light on the questions in this case.[10] Nor has our independent review of New Mexico law uncovered any statutory or case law that is contrary to the

---

[10] Mr. Butt reproduces the definitional sections of the Fiduciary Obligations and Investments Act, N.M. Stat. Ann. §§ 33-1-1 to 33-1-20 (1953), the Uniform Trustees Accounting Act, N.M. Stat. Ann. §§ 33-2-1 to 33-2-24 (1953), and the Uniform Trusts Act, N.M. Stat. Ann. §§ 33-3-1 to 33-3-22 (1953). The Fiduciary Obligations and Investment Act defines "fiduciary" as including "a trustee." N.M. Stat. Ann. § 33-1-1(1). The Uniform Trustees Accounting Act and the Uniform Trusts Act define "trustee" as including "successor . . . trustee[s]." *Id.* §§ 33-2-1 and 33-3-1(2). From these bare-bones provisions, Mr. Butt divines a "framework of legislative enactments [that] created a succession as a matter of law," and, therefore, "when Mr. Luthy died, his successor in interest, *i.e.*, the Albuquerque National Bank became a successor trustee." Appellant's Opening Br. at 19. Such a reading is unavailing. Nothing in the cited acts touches upon the methods by which a trustee is appointed or by which a successor trustee accedes to trusteeship. The mere fact that the acts contain the word "trustee" and "successor trustee" does not establish "a framework" under which executors in New Mexico automatically accede to any trusteeship held by a decedent.

provisions of the UTC.  Indeed, it appears that the UTC, rather than contracting the methods by which a successor trustee may be appointed, expanded the options available under prior law.  *Compare* Restatement (Second) of Trusts § 108 (1959) (providing for appointment of a new trustee "by a proper court" or "by the person, if any, who by the terms of the trust is authorized to appoint a trustee"),[11] *with* N.M. Stat. Ann. § 46A-7-704(C) (providing for appointment of a new trustee to a vacant trusteeship by the court, by "a person designated in the terms of the trust to act as successor trustee," or by "a person appointed by unanimous agreement of the qualified beneficiaries").  Consequently, we find no merit to Mr. Butt's argument that trust law from years gone by renders his fiduciary duty claim any more sound that it appears under the UTC.

But even accepting that the Bank never acceded to trusteeship, the district court's analytical stopping point is a curious one.  If the trust marched on into the future but no trustee administered it, what then was the status of the trust these past forty-four years?  The UTC provides no answer to this question, nor, it appears, does New Mexico case law.  A generally accepted common law

_____

[11] We note that New Mexico courts often turn to the Restatement (Second) of Trusts for guidance.  *See, e.g.*, *Aragon v. Rio Costilla Coop. Livestock Ass'n*, 812 P.2d 1300, 1302 (N.M. 1991) (relying on the Restatement's definition of "express trust"); *Forest Guardians v. Powell*, 24 P.3d 803, 808 (N.M. Ct. App. 2001) (discussing the Restatement's provisions concerning charitable trusts); *In re Estate of Boyer*, 868 P.2d 1299, 1304 (N.M. Ct. App. 1994) (finding the Restatement's reasoning "persuasive").  Thus, where no New Mexico statute or case is on point, we likewise turn to the Restatement for guidance.

principle, which supplements the UTC, *see* N.M. Stat. Ann. § 46A-1-106,

instructs that "[u]pon the death of a sole trustee who has devised or bequeathed

the trust property, the title to the trust property passes subject to the trust to the

devisee or legatee, unless it is otherwise provided by the terms of the trust."

Restatement (Second) of Trusts § 105; *see also* George Gleason Bogert et al.,

*Bogert's Trusts and Trustees* § 529 (rev. 2d ed. 2005) (collecting cases). But the

devisee "is not permitted to administer the trust unless by the terms of the trust he

is so authorized," and if "he is not so authorized, a new trustee will be

appointed." Restatement (Second) of Trusts § 105 cmt. a. Perhaps the Bank, as

testamentary trustee of the Luthy estate, obtained title to the trust property but not

authority to administer the trust. This is a puzzle, like a car without a driver. We

believe the simpler and more straightforward way to analyze this case is to

conclude that the trust terminated at Mr. Luthy's death.

2. *The Trustee Power Was Personal to Mr. Luthy*.

Although, as a general rule, trusts do not fail upon the death of a trustee,

"[a] settlor may manifest an intention . . . that the trust continue only for as long

as a particular person serves as trustee. In [this] case[], the rule that a court will

appoint a substitute or successor trustee does not apply." Restatement (Third) of

Trusts § 31 cmt. b (2003); *see also In re Doe's Will*, 285 N.W. 764, 766 (Wis.

1939) ("If upon such construction of the instrument it appears that a power lodged

with the trustees in connection with the trust is a special confidence reposed in

-21-

this particular trustee or set of trustees, or is to be exercised only upon his or their

personal judgment or discretion, such power can only be exercised by the

designated trustee and will not pass to a substituted trustee." (internal quotation

marks and citation omitted)); Bogert et al., *supra*, § 529 ("The death of a sole or

surviving trustee does not terminate the trust, *unless* the settlor has manifested an

intention that the trust shall be personal to the particular trustee . . . ." (emphasis

added)).[12]

After trial, the district court issued a detailed set of factual findings, none

of which are challenged on appeal.  Based on these findings, we conclude that

when Mr. Luthy declared the trust, the powers of trusteeship were meant to be

personal to him.  In the trust instrument itself, Mr. Luthy stated that the three

---

[12] Although we cannot find a New Mexico case stating this widely-accepted and long-established common law rule, citations from other jurisdictions abound and we have no trouble concluding that the New Mexico Supreme Court would adopt this rule if faced with the question.  *See, e.g.*, *South End Bank & Trust Co. v. Hurwitz*, 21 A.2d 407, 408 (Conn. 1941); *Stephens v. First Nat'l Bank of Atlanta*, 150 S.E.2d 865, 867 (Ga. 1966) (citing *Gilmore v. Gilmore*, 41 S.E.2d 229, 233 (Ga. 1947)); *Yates v. Yates*, 99 N.E. 360, 363 (Ill. 1912) (citing *French v. N. Trust Co.*, 64 N.E. 105, 108 (Ill. 1902)); *Bray v. Old Nat. Bank in Evansville*, 48 N.E.2d 846, 850 (Ind. Ct. App. 1943); *Anderson v. Ratliff*, 178 S.W.2d 946, 948 (Ky. Ct. App. 1944) (citing *Penn v. Pa. Co. for Insurances on Lives and Granting Annuities*, 171 S.W.2d 437, 441 (Ky. Ct. App. 1943)); *In re Warner's Will*, 61 N.W.2d 840, 842–43 (Minn. 1953); *Duncan v. Elkins*, 45 A.2d 297, 298 (N.H. 1946); *In re Walker*, 53 N.E.2d 378 (N.Y. 1943); *Pippin v. Barker*, 64 S.E.2d 830, 831 (N.C. 1951) (citing *Welch v. Wachovia Bank & Trust Co.*, 38 S.E.2d 197, 201–02 (N.C. 1946)); *Staley v. Kreinbihl*, 89 N.E.2d 593, 599 (Ohio 1949); *Rogers v. Rea*, 120 N.E. 828, 828–29 (Ohio 1918); *Schloss v. R.I. Hosp. Trust Co.*, 10 A.2d 344, 345 (R.I. 1940); *In re Houghton's Estate*, 105 A.2d 257, 260 (Vt. 1954); *In re Doe's Will*, 285 N.W. 764, 766 (Wis. 1939).

original parties to the Lease operation "agreed that I was to have complete control and final decision in all matters pertaining to the handling of said lease." App. Vol. I, at 119. No provision was made for successor trustees and the emphasis throughout the instrument is on Mr. Luthy's personal and complete control over the handling of the Lease. *See* Dist. Ct. Mem. Dec. 4; *Rogers*, 120 N.E. at 828 (finding that language in a will "makes the judgment and discretion of [the named trustee] absolutely essential to the creation of the trust," and noting that "[t]his is self-evident when it is noted that [the testatrix] makes no provision whatsoever for any failure by death or otherwise of the trustee to act"); *Schloss*, 10 A.2d at 345 (finding that a settlor created a trust "to secure for himself the counsel and guidance of his brother" as trustee and finding "nothing in [the trust] instrument which even tends to indicate that, in the event of [the trustee's] death or disability, any other person was to succeed him as trustee"). Mr. Luthy was not charged with mere ministerial matters as trustee, but rather with exercising his particular business judgment in initiating, negotiating, and finalizing a wide array of complex oil and gas transactions under the Lease. *See French v. N. Trust Co.*, 64 N.E. 105, 108 (Ill. 1902) ("As a general rule, where a power is discretionary, and of a kind that indicates personal confidence in the one selected to exercise it, a court of equity will not assume to exercise the discretion, and the power will not pass to a successor appointed by the court . . . . If the power is ministerial . . .

although there may be some measure of discretion involved, the court will compel the performance of the power, or execute it in the place of the trustee.").

We recognize that "the mere fact that a power is conferred upon the trustee by name is not sufficient in itself to indicate that the power does not devolve upon successor trustees." *In re City Bank Farmers Trust Co.*, 64 N.Y.S.2d 523, 525 (N.Y. Surr. 1946) (citing *In re Walker*, 53 N.E.2d 378). "[W]hether the testator intended a discretionary trust power to be ex officio or to be a purely personal power limited to the original trustees is to be ascertained by construing the language of the will as a whole in the light of all the surrounding circumstances." *In re Warner's Will*, 61 N.W.2d at 843; *see also Welch*, 38 S.E.2d at 201 ("Whether the powers are personal in character is to be ascertained from a consideration of the will as a whole, and from the nature and objects of the trust created thereby, in the light of surrounding circumstances."); *In re Houghton's Estate*, 105 A.2d at 260 ("Practically, the question reduces itself to determining whether such powers are in point of fact personal or *ex officio*, and this, at least in the absence of statute, depends upon the intention of the . . . settlor, to be gathered from the terms of the instrument creating the trust and from the surrounding circumstances."). Here, the surrounding circumstances and subsequent history of dealings among the parties with an interest in the Lease

confirms our reading of the trust instrument as conveying powers personal to Mr. Luthy.[13]

First, in an affidavit signed in 1954, six years after the Declaration of Trust, each of the interest holders in the Lease agreed that:

> the remaining state oil and gas leases acquired by the syndicate before mentioned are still and always have been held in the name of Fred Luthy, with full and complete power of disposition of the same, and the beneficial owners entitled to profits from said state leases are presently Fredy Luthy, Defiance Coal Company, and Paul Butt Jr., and that all of the holders of the beneficial interests in said oil and gas leases and properties have always conceded and now concede that Fred Luthy has the full and complete power of disposition of said leases and interests thereunder, and that no purchaser or person dealing with Fred Luthy is required to look to the holders of the beneficial interests or the disposition of the proceeds therefrom.

App. Vol. I, at 126; *see also* Dist. Ct. Mem. Dec. 5. As in the trust instrument, the emphasis in the affidavit is on Fred Luthy's personal control over the Lease and no provision is made for the continuance of the trust after his demise. As the trial testimony demonstrates, Mr. Luthy and the original parties to the Lease enjoyed a close business relationship, and the facts suggest that Mr. Luthy's associates placed particular faith in his abilities.

---

[13] We recognize that subsequent history cannot alter the critical factor in interpreting a trust instrument—the settlor's intent at the time of the trust's creation—but such history can shed light on what that intent was, especially where that history consists of the actions of original parties to the trust who enjoyed a perspective much sharper than ours concerning the distant events in this case.

Second, following Mr. Luthy's death, the parties' relationship to each other and to the trust changed dramatically. The Bank—Mr. Luthy's successor in interest—did not assert, and was not recognized as having, the unilateral authority over business dealings regarding the Lease that was exercised by Mr. Luthy. Instead, with regard to multiple transactions, each interest holder in the Lease was asked to give specific approval. For example, just four months after Mr. Luthy's death, each interest holder jointly signed a letter offering the Humble Oil & Refining Company mineral interests in Tract 6. If the Bank were meant to continue as trustee with full authority to deal with the Lease, there would have been no reason to obtain the signatures of all the interest holders. Moreover, there would have been no reason to explain in the offer letter that "the leasehold interest is actually owned one-third by Paul Butt Jr., one-third by Defiance Coal Company, and one-third by the Estate of Fred Luthy, deceased." Dist. Ct. Mem. Dec. 7; App. Vol. II, at 442. Indeed, in the opinion of Humble Oil's attorney, who enjoyed a vantage point much closer than the one we find ourselves in today, upon Mr. Luthy's death "his power of control and sale . . . ceased and [was] not vested in his heirs or devisees." Dist. Ct. Mem. Dec. 7; App. Vol. II, at 449. Additionally, some nine months after Mr. Luthy's death, Mr. Butt *independently*, and by separate instrument, conveyed his interest in six tracts to Humble Oil. Dist. Ct. Mem. Dec. 8. If the Trust was still extant at that point, such an action on Mr. Butt's part would have been unnecessary and improper.

-26-

Equally convincing is the shift in practices that occurred after Mr. Luthy's death with respect to the Rankin and Turner Farmouts. Before his death, Mr. Luthy was independently dealing, on behalf of all parties, with Mann Rankin about the assignment of a single tract under the Lease. *Id.* The dealings with Mr. Rankin continued after Mr. Luthy's death, but the Bank did not step into Mr. Luthy's shoes. Instead, Mr. Rankin explicitly stated that he was assigning an overriding royalty interest to *each* of the interest holders in the Lease. *Id.* at 9. If the Bank served as trustee for each of these interest holders, in the same capacity as Mr. Luthy served before his death, there would have been no reason to make this specification. The royalty interest would have just been assigned to the Bank and, in its capacity as trustee, it would have distributed the royalties to the beneficiaries as they accrued.

Similarly, before his death, Mr. Luthy offered to assign two tracts to Charles R. Turner. *Id.* After Mr. Luthy's death, the dealings with Mr. Turner continued but, again, the Bank did not step into Mr. Luthy's role as the sole entity making offers on behalf of the Lease. Instead, *each* interest holder reaffirmed the offer in a *joint* letter. *Id.* Moreover, Mr. Butt independently discussed transactions with Mr. Turner, *id.* at 10–11, a scenario that would not have occurred while Mr. Luthy was alive and serving as sole trustee for the Lease. Most significantly, when the Bank did act independently in assigning the entire interest in a tract to Mr. Turner (thereby ignoring the other interest holders), it

felt compelled to have all the interest holders ratify the transaction. *Id.* If the Bank enjoyed the powers and rights that Mr. Luthy had enjoyed as trustee during his lifetime, such a ratification would have been unnecessary and inconsistent with the terms of the trust, and the role of a trustee.

The dealings surrounding the Shell Oil Assignment also confirm that the parties understood the trust to be at an end after Mr. Luthy's death. Notably, the Bank refused to take individual action on a requested transfer order because, as the Bank explained, the oil company had erroneously assumed that the Bank owned the entire interest. Instead, the Bank cautioned that it was merely an "equal partner." *Id.* at 13; *see also* App. Vol. II, at 506.

In sum, throughout the post-Luthy period—throughout all of these dealings—Mr. Butt never objected to being treated in his individual capacity as an owner of the Lease. Indeed, in May 1972 he requested that Shell deal with him individually rather than through the Bank, Dist. Ct. Mem. Dec. 14, the very entity he now contends was serving as his trustee at the time. If Mr. Butt believes the trust survived Mr. Luthy's death, it is a realization that he has come to rather late in the game.

We recognize that, aside from the Humble Oil Assignment, the record does show that the Bank may have assigned more than its own one-third interest in two transactions, the Machris Assignment and the Pauley Petroleum Assignment. While these transactions may be evidence of mistake or overreaching on the part

of the Bank—a matter we deal with below—they do not prove that the Bank was serving as trustee for the Lease. The existence of a few *ultra vires* transactions by the Bank after Mr. Luthy's death does not cut against our reading of the trust instrument as conveying powers personal to Mr. Luthy that ceased upon his death.

We also recognize that, at trial, Mr. Butt testified that, for each of the post-Luthy transactions to which he gave his individual approval, "[e]verything went through the bank. . . . The bank would hammer out all the details, would negotiate the terms, and I would simply go along with it. . . . [T]he bank would initiate all the paperwork, do all the . . . negotiations and then just give it to me to sign." App. Vol. III, at 670. This does not prove that the Bank served as a trustee. It proves only that Butt understood that his interests and those of the Bank's beneficiaries were aligned and that he chose to defer to the Bank's professional expertise. An individual who exercises his property rights by signing legal instruments cannot impose fiduciary duties on another by trusting it and choosing to "go along with" its actions.

## B. Should the District Court Have Imposed a Constructive Trust?

Mr. Butt maintains that even if the Bank does not serve as trustee of an express trust, it may yet hold profits from the Lease that belong to him. He notes that the district court acknowledged this possibility but declined to make determinative findings given its ultimate disposition of the case. Mr. Butt seeks a

remand for an accounting and the imposition of a constructive trust over any monies that are found rightfully to belong to him.

Although somewhat inartfully drawn, Mr. Butt's filings before the district court are sufficient to preserve this issue. The overriding theory of Mr. Butt's complaint is that the Bank acted with respect to the Lease in a way hostile to his interests and thereby procured profits that rightfully belong to him. Moreover, in his pre-trial filing before the district court, Mr. Butt specifically noted that the Bank may have acted adversely to his interest with regard to the Turner Farmout, the Machris Assignment, and the Pauley Petroleum Assignment. *See* App. Vol. I, at 78–79, 81. He repeated this assertion at trial as well. *See* App. Vol. III, at 878.

Under New Mexico law, "[a] constructive trust . . . is imposed to prevent the unjust enrichment that would result if the person having the property were permitted to retain it. The circumstances where a court might impose such a trust are varied. They may involve fraud, constructive fraud, duress, undue influence, breach of a fiduciary duty, or similar wrongful conduct." *Aragon*, 812 P.2d at 1304. Because Mr. Luthy's name is the only one that appears on the Lease, the Bank, as his testamentary trustee, was in a position to act on behalf of the entire Lease without the consent of the other owners. Such conduct would, of course, be wrongful and warrant the imposition of a constructive trust on any resulting profits that were not shared with the other beneficial owners.

The district court found that the Bank may have acted adversely to Mr. Butt's rights with respect to three transactions: the Turner Farmout, the Machris Assignment, and the Pauley Petroleum Assignment. With respect to the Turner Farmout, the district court found that "the Ratification and Amendment to Agreement cured any problem with the original farmout agreement entered into by [the Bank]." Dist. Ct. Mem. Dec. 11. We agree with that assessment. Thus, we are left with the Bank's potentially wrongful actions surrounding the Pauley Petroleum and Machris Assignments. And it is with regard to those two assignments that we reverse the district court and require a limited remand.

On remand, the district court should address whether Mr. Butt has a valid claim for an accounting with regard to these transactions, including whether any such claim is time barred. If his claim is valid, and if the accounting reveals wrongly withheld profits, then imposition of a constructive trust may be warranted. The remand is limited to these two transactions because, having had the benefit of full discovery and a bench trial in this case, Mr. Butt has failed to bring to the attention of the district court or this Court any other potentially problematic transactions.[14]

---

[14] The trial court noted that Mr. Butt had ample opportunity for discovery in this case, and Mr. Butt's counsel conceded as much at trial. *See* App. Vol. III, at 877 ("[U]nder Rule 26 scope of discovery, you had the ability to inspect [Bank documents] if you wished. And if you were denied access to it, certainly Judge Garcia would have ordered it. And if he hadn't, I would have, had the matter been brought to me.").

### III. CONCLUSION

Consistent with these conclusions, we AFFIRM in part and REVERSE in part. The case is remanded to the district court to proceed in accordance with the specific instructions above.